Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/31/2025 09:11 AM CDT

Nancy E. White, appellee, v. Keith N. White, appellant,
and J.E.M. Farms, LLC, a Nebraska limited liability
company, intervenor-appellee.

___ N.W.3d ___

Filed October 31, 2025.    No. S-24-964.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees.

2. **Attorney Fees: Appeal and Error.** On appeal, an appellate court will uphold a lower court's decision allowing or disallowing attorney fees for frivolous or bad faith litigation in the absence of an abuse of discretion.

3. **Modification of Decree: Judgments.** A consent decree is treated as an agreement between the parties and is accorded greater force than ordinary judgments.

4. **Words and Phrases.** The term "frivolous" connotes an improper motive or legal position so wholly without merit as to be ridiculous.

5. **Actions.** Any doubt about whether a legal position is frivolous or taken in bad faith should be resolved in favor of the one whose legal position is in question.

6. **Divorce: Property Division: Proof.** The burden of proof rests with the party claiming that the property is nonmarital.

7. **Divorce: Property Division.** All property accumulated and acquired by either spouse during the marriage is generally considered part of the marital estate.

8. ____: ____. Property that a party brings into a marriage, which was acquired before the marriage, by gift, or by inheritance, is usually excluded from the marital estate and set aside as separate property.

9. ____: ____. Separate property can become marital property through transmutation when the separate property has been inextricably mixed with marital property or with the separate property of the other spouse.

10. **Appeal and Error.** Absent plain error, appellate courts can consider only errors both specifically assigned and specifically argued in the parties' initial brief.

11. ____. Conclusory assertions unsupported by coherent analytical argument fail to satisfy the requirement that an error be specifically argued.

12. ____. Absent plain error, courts are neutral arbiters of matters the parties present.

13. ____. The requirement that appellants specifically assign and specifically argue any alleged error of the lower court is not to impede appellate review but to facilitate it by preventing the parties from shifting to appellate courts the critical tasks of searching the record for relevant facts, identifying possible trial error, and articulating a legal rationale that supports the assigned error.

14. ____. A party cannot complain of error which the party has invited the court to commit.

15. **Property Division: Proof.** The burden of proving the existence of a debt is upon the party who seeks to divide it.

16. **Divorce: Property: Words and Phrases.** Dissipation of marital assets is defined as one spouse's use of marital property for a selfish purpose unrelated to the marriage and at the time when the marriage is undergoing an irretrievable breakdown.

17. **Appeal and Error.** An appellate court will not consider an argument or theory raised for the first time on appeal, because a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition.

18. **Divorce: Property Division: Judicial Sales.** A court in a dissolution action may provide for the sale of all or part of the parties' assets in lieu of dividing them, if to do so is reasonable in the light of the facts, the circumstances of the parties, and the nature of their property.

Appeal from the District Court for Antelope County: James G. Kube, Judge. Affirmed.

David A. Domina, of Domina Law Group, P.C., L.L.O., for appellant.

Michael J. Tasset, of Johnson & Mock, P.C., L.L.O., for appellee Nancy E. White.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Freudenberg, J.

## I. INTRODUCTION

A husband appeals from a decree of dissolution entered after a bifurcated trial on a complaint in intervention. The husband argues that the court erred when it overruled his motion for costs and fees associated with his wife's contesting the intervenor's claim to a one-half interest in one of two marital farms. With respect to the dissolution action, the husband argues the court should have set aside as nonmarital the assets allegedly traced from his premarital and inherited property. He also argues the district court erred by (1) failing to treat as marital debt loans the husband took out during the pendency of trial to pay ordered temporary spousal support, (2) failing to find dissipation by the wife of a jointly held loan, and (3) ordering the marital farms sold instead of awarding them to the husband with an equalization payment. We affirm.

## II. BACKGROUND

Keith N. White and Nancy E. White married in 1992 and had been married for 31 years by the time of the dissolution trial. No children were born of the marriage. Both have adult children from previous marriages. Both Keith and Nancy are licensed real estate brokers and appraisers and worked together under White Realty and Appraisal (White Realty). Keith and Nancy were equal shareholders in White Grain Company, Inc. (White Grain), which had originated before the marriage. White Grain had been dissolved and its assets sold off many years before the complaint for dissolution was filed. Keith was approximately 82 years old, and Nancy was approximately 68 years old.

They jointly owned a house in Neligh, Nebraska (Neligh House), valued at $350,000, and a nearby office, also in Neligh, valued at $75,000, both purchased during the marriage.

They also jointly owned a second house that they purchased during the marriage, in Niobrara, Nebraska (Niobrara House), valued at $410,000, and a storage shed in Niobrara valued at $100,000. There was a previous house in Niobrara purchased by the parties during the marriage and located on the same land (First Niobrara House). That house was destroyed by flooding.

Keith and Nancy owned two farms that were purchased during the marriage, referred to as "Farm 1" and "Farm 2," which have been jointly titled in their names since they were purchased. Farm 1 was purchased in 2006 for $360,000 and was appraised at $1.04 million at the time of trial. Farm 2 was purchased in 2008 for $472,000 and was appraised at $1.04 million at the time of trial, but half of that land was claimed by the third-party intervenor. The values set forth in the appraiser's report were for December 2022. During Nancy's testimony, Nancy agreed that the values identified in the appraisals were reflective of the properties' fair market values and that she did not disagree with the values of the assets "as established in the documents provided by [Keith]." Both farms were rented and regularly produced income. Neither Keith and Nancy nor their children are engaged in farming on the land. None of the parties' property was encumbered at the time of trial except for the farms, which Keith testified were encumbered by approximately $65,000 in debt.

## 1. Temporary Support

In September 2022, the court ordered that Keith pay Nancy $4,000 per month in temporary spousal support. Nancy had filed an affidavit of financial condition stating she had retirement income of approximately $1,000 per month and expenses of approximately $6,000.

Before trial on the dissolution action, in November 2023, the court overruled Keith's motion to modify the order of temporary support. Keith submitted an affidavit averring that he had "suffered surgical procedures and periods of inability to work,"

his "health has declined," and his "stamina is changed." He further averred that he had "paid [Nancy] support of $40,000, the appraiser for our case $15,000, [and his] lawyer, and tried to survive" and that he had "been forced to borrow $40,000 from [his] children." The court explained that while Keith alleged his health had declined, he presented no evidence regarding how this affected his ability to either earn income or pay the ordered spousal support.

Keith testified at the dissolution trial that Nancy was paying their health insurance provided through her previous government job. Nancy confirmed that during the period of the temporary spousal support payments, she had been paying approximately $700 per month for their health insurance.

At trial, Keith testified that he had borrowed $50,000 from his son and an additional $20,000 from a bank to cover the temporary support payments.

In its dissolution decree entered in July 2024, the court found that an award of permanent spousal support was not justified under the circumstances. The court found that Keith was entitled to a credit of spousal support paid to Nancy for the months of March through July 2024, for a total of $20,000 to be applied within the court's equalization.

## 2. Complaint in Intervention

J.E.M. Farms, LLC (J.E.M.), filed a complaint in intervention, alleging a one-half interest in Farm 2. J.E.M. prayed for an order compelling conveyance or quieting title. The complaint alleged that although the initial deed conveyed Farm 2 to Keith and Nancy only, at a subsequent unspecified date, Keith and Nancy, as grantors, executed and delivered to J.E.M. a deed granting J.E.M. an undivided one-half interest in Farm 2. J.E.M. alleged it originally advanced the full purchase price for the farm and was reimbursed only for half. J.E.M. alleged the parties had shared possession and revenues of the property since the initial purchase.

In his answer, Keith admitted to the allegations in the complaint in intervention. Nancy, however, denied the allegations and affirmatively alleged the complaint was barred by the applicable statute of limitations and statute of frauds.

Keith sought partial summary judgment in favor of J.E.M., and J.E.M. also sought summary judgment. Nancy opposed the motions. The court overruled the motions for summary judgment.

At the bifurcated trial, J.E.M. offered, and the court accepted into evidence, a copy of a check issued by Pat Meuret, co-owner and manager of J.E.M., to Keith in 2008 for $471,581.25. The evidence at trial also consisted of a warranty deed issued in 2008 from the prior owner of Farm 2 to Keith and Nancy as joint tenants; a promissory note to the order of Keith and Nancy for $70,350.04 with annual interest, issued in 2008; and checks signed by Nancy on behalf of "Keith White, Holt Co. Farm #2," issued to J.E.M. in December 2019, 2020, and 2021. The 2020 and 2021 checks state in the memo line that they are for J.E.M.'s rent share, less taxes. In a revocable transfer on death deed for Farm 2 executed in 2020, Keith and Nancy set forth that, "[a]t the date of this conveyance, such real estate is owned by Keith . . . and Nancy . . . , as joint tenants."

Meuret testified that, in 2008, when the land was going to be for sale at auction, he and Keith discussed purchasing the land "together 50/50." Thereafter, they were going to split the rent revenue from the land, as well as any expenses. Meuret testified that J.E.M. issued the check for the purchase price, minus a $1,000 deposit by Keith, with the agreement that Keith and Nancy were going to pay back their half after obtaining financing. According to Meuret, Keith and Nancy obtained financing at an advantageous interest rate and Meuret was eventually paid back for half, plus an extra $70,350.04 that he would pay back with interest through deductions from his half of the rent revenue.

Meuret testified that checks for half the rent were delivered to him by Nancy and that Nancy sent him accounting records reflecting income and expenses. After Meuret's debt was paid, Keith and Nancy signed a deed reflecting J.E.M.'s half interest. Meuret said that he did not record the deed and that it had since been lost.

Keith likewise testified that, after several years, the $70,350.04 debt, plus interest, was paid. After that occurred, which was sometime in 2016 or 2017, Keith and Nancy signed a deed reflecting J.E.M.'s one-half interest. Keith testified he had made a photocopy of the deed, which he kept in his files. He personally delivered the original to Meuret. Keith could not remember when the last time was that he saw the copy of the deed, but he stated that "after the divorce proceedings, in that period of time, that file disappeared." Keith could not recall for certain who had prepared the deed. He said it was not him and guessed it was a notary and secretary at White Realty, whose notary book Keith did not think reflected that she had notarized the deed.

Keith testified he borrowed the extra $70,350.04 because of the low interest rate. He did not use it to pay down the mortgage on Farm 1 that was at a 1-percent higher interest rate, because it was on a structured payment. He could not explain why he gave the $70,350.04 "back to the guy . . . [he] didn't owe it to, who apparently didn't need a loan for $70,000," but the promissory note by J.E.M. reflects a higher interest rate than either loan.

Keith testified that, from the inception of the arrangement with J.E.M., Nancy understood it. He admitted, however, that Nancy was not directly involved in the negotiations or the purchase; thus, whatever Nancy knew about the terms of the transaction, she knew only what Keith told her. Keith testified that he and Nancy treated J.E.M. as a half owner of Farm 2.

Nancy testified that Keith told her to divide the rent income from Farm 2, after taxes, 50 percent for themselves and 50 percent to J.E.M. Nancy acknowledged that Keith had told

her that they were joint owners of Farm 2 with J.E.M. But she also knew J.E.M. was not on the deed. When she asked Keith where the deed or contract was protecting J.E.M.'s interest, Keith told her not to worry about it and to "just do what [she] was told." Nancy testified that she was unaware at the time of the sale that J.E.M. had provided money to purchase Farm 2. She summarized, "I have never understood the situation."

In her deposition testimony, Nancy likewise said she did not know what the arrangement with J.E.M. was and she had done what Keith had told her to do. When asked if she "contest[ed]" Meuret's ownership of a one-half interest in Farm 2, she answered, "I don't contest anything. I don't know what the arrangement is."

Following trial, the court entered a consent decree to quiet title to Farm 2 in favor of J.E.M. The court set forth in its order that the matter came before the court on the parties' joint motion and that "[t]he parties have agreed with respect to [J.E.M.'s] amended complaint in intervention and any matters pertaining thereto, *that each party will pay their own attorney fees and court costs herein*," which agreement was "confirmed by [the district] court." The order was signed by the attorneys of all three parties. This language was identical to the proposed consent decree attached as an exhibit to J.E.M.'s motion for approval of the proposed consent decree, wherein J.E.M. set forth that the attached proposed consent decree had been "approved as to form and content" by Nancy, Keith, and J.E.M.

Despite that language, under the dissolution action, Keith's counsel later asked for attorney fees and costs associated with the interpleader and related issues, in the amount of $34,291.87. In his briefing following trial on the dissolution action and citing to Neb. Rev. Stat. § 42-351 (Reissue 2016), Keith asserted that there was "no statute permitting the recovery of attorney's fees in the intervention proceeding, but there certainly is one permitting an award of attorney's fees in an action for dissolution of marriage." Keith also appealed to

Neb. Rev. Stat. § 25-824 (Reissue 2016), alleging Nancy had made a frivolous defense to the complaint in intervention. The court found that the parties shall be responsible for their own attorney fees and costs in the dissolution action. The court found that Nancy's decision to take the matter of J.E.M.'s interest in Farm 2 to trial was not in bad faith and that she did not assert a frivolous position during trial.

### 3. Dissolution Trial
### and Decree

The issues presented in the dissolution action included the division of the marital estate, the alleged tracing of Keith's premarital and inheritance assets, the alleged wrongful dissipation of a "COVID loan" by Nancy, and Nancy's spousal support. Keith's primary claims to nonmarital assets related to his premarital business interest in White Grain and an inheritance from his father in the amount of $340,000. Keith did not request the appreciated value of any traced assets. In his pretrial and posttrial briefing, he stated: "Keith does not seek appreciation in values. He asks only that the value of assets he brought to the marriage or inherited be set aside to him at their value when either a) the marriage commenced, or b) the assets were acquired."

Although the court expressed reservations, it accepted into evidence 166 exhibits "in mass at the outset" before any witnesses testified at trial. The parties agreed to provide closing briefs to "help the Court understand the evidence better."

Both Keith and Nancy testified at the dissolution trial. There were no expert witnesses. Keith generally testified that, during the marriage, he did not have any bank accounts that were not joint with Nancy, and that he did not acquire any property during the marriage that he did not title in joint tenancy with Nancy.

### (a) COVID Loan

The district court concluded that proof of wrongful disposition of the COVID loan funds was "wholly lacking," as there

was insufficient proof regarding the location of the funds, who had access to them, and what they were used for or how they were spent. It also noted that the loan had been paid.

At trial, Keith testified there was a nonforgiven COVID-19-related "Farm Credit Service loan[]" with $25,000 still outstanding. No documentary evidence was submitted in support of the loan's existence. Keith indicated this was because Nancy had stolen their records, which Nancy denied. Keith also testified he had been making monthly payments on the loan, but he did not provide bank records reflecting the payments.

Keith testified that Nancy took out the loan, but acknowledged it was in both their names for their business, White Realty. He testified he did not know what the proceeds of the loan were used for. Keith further testified that, while he knew they were taking out the loan, "when [Nancy] presented that to me I thought it was Covid money that did not have to be repaid."

Nancy acknowledged the existence of the loan and testified it arose after the bank president called "and told all the business people that he wanted us to take that loan out, that it could be interest free or forgiven, but if it had to be repaid it was very low interest." She asked Keith about it, he said to go ahead and apply, and it was electronically deposited into the White Realty account. Nancy testified White Realty expenses were taken out of that account, and she could not say what, specifically, the loan was used for. Nancy was not questioned as to whether the loan had since been paid off.

### (b) White Grain

In its dissolution order, the district court did not set off any premarital assets of White Grain as traceable and, therefore, as Keith's nonmarital property. Neither did it award to either party any value in relation to, or any interest in, White Grain.

Keith testified at the dissolution trial that when he married Nancy, he was an equal partner with his brother in White Grain. White Grain had locations in Genoa, Nebraska;

Oakdale, Nebraska; and Neligh. They bought and sold grain, feed, and seed and had grain storage facilities at each of their three locations.

One document entered into evidence reflected that, in 1992, White Grain had a total value of $2,353,410, and listed various specific assets and their values at that time. Keith clarified that the value did not reflect the company's debts. Another exhibit was a document entitled "Financial Statements," prepared by "Simon & Schmitz, P.C., Certified Public Accountants," in 1992, setting forth a total stockholders' equity of $957,174. Keith testified that, as an equal partner with his brother in 1992, he owned half of that value.

In 1995, Keith became the sole owner of White Grain through an agreement with his brother that resulted in fewer assets of the company, including disposing of the Genoa facilities.

In 2005, Keith, as secretary and president, signed a stock certificate certifying that Nancy held 50 shares of common stock in White Grain. The White Grain corporate minutes around the same time state that it was "desirable to place 50 shares of stock from White Grain . . . to Nancy." The minutes are signed by Keith as chairman and secretary. In years after, Keith was the president, the secretary, the treasurer, and a director of White Grain. Nancy was a director.

Keith testified he retained the Oakdale and Neligh locations until 2003, when they were sold for $650,000. The debts on the properties were about $650,000, so there was no capital obtained from selling that real estate. The property and equipment sold in 2003 are reflected in corporate minutes admitted in evidence. Keith testified that a bin site in Neligh, owned by White Grain, was not part of those transactions.

In 2013, White Grain dissolved. Any remaining assets, including the Neligh bin site, were transferred to Keith and Nancy as joint tenants. Keith testified that in 2013, "White Grain" sold a Neligh bin site for $225,000 to "Veik." Exhibit 39 is an apparent spreadsheet of unknown origin and sets forth that some property was transferred from White Grain to Keith

and Nancy in 2011 and then sold by Keith and Nancy to "Veik" on December 5, 2013, for $225,000. Also admitted as evidence is a list, likewise of unknown origin, of deed transactions under the heading "White Grain." It also reflects the 2011 and 2013 conveyances. Another exhibit contains a warranty deed dated December 5, 2013, conveying property from Keith and Nancy, as husband and wife, to Patrick Veik and Cheryl Veik, as husband and wife, in consideration of "ONE DOLLAR and other valuable consideration," along with a county assessor's parcel information for property in Neligh owned by the Veiks and assessed in 2021 and 2022 at $227,620.

Keith testified that the $225,000 was used to purchase the Niobrara House. Numerous receipts for construction work and materials from 2012 to 2014, some of which referred to the Niobrara House, were admitted as one exhibit. Another exhibit was a list, presumably prepared by Keith, summarizing expenditures on the Niobrara House in a total amount of $367,182. All the listed expenditures, except a dock for $1,108.31 in 2022 and foundation for $11,566.72 in 2005, occurred between 2012 and 2014. The total sum included a "[l]easehold" for $100,000 and a "[b]ill of [s]ale" for $162,000. According to an appraisal report prepared for Keith, the First Niobrara House was built in 2013, but redone after a 2019 flood.

Keith testified there was equity in the equipment on the former White Grain properties, which equipment they sold over a period of 3 years. Keith was unsure of the sums of the sales. Keith testified that the proceeds from the sales of equipment were generally spent for marital purposes. Nevertheless, he said he could identify three marital assets purchased with those funds. First, he testified that the office in Neligh was purchased entirely with the proceeds of the sale of White Grain assets. There is a notation in exhibit 39 for 2006, "White Grain buys office . . ." corresponding to a debit of $25,000, and another in the same exhibit stating that the office was transferred to Keith and Nancy in 2011. Second, Keith testified that the storage shed in Niobrara was purchased with

money from White Grain equipment sales. A further entry in exhibit 39 states, "2014 Buys Quonset, fixtures & equipment @ Niobrara . . . ," corresponding to a debit of $56,000. Third, Keith testified that White Grain equipment sale funds were used to purchase a one-half interest in Farm 2.

In a posttrial brief, Keith asserted he was entitled to set off as nonmarital half of White Grain's $957,174 book value before the marriage. Thus, Keith claimed $478,478 as non-marital, and he pointed out that the market value of the assets exceeded that. He said he could trace the $225,000 and the $150,000. He also alleged "additional White Grain funds" were put toward the purchase of the Neligh House. He did not allege in his posttrial brief that White Grain funds were used to purchase half of Farm 2. But in an annotation within his posttrial brief, Keith appeared to concede that only $225,000 of White Grain assets were clearly traceable. He stated:

> Keith asserts that $225,000 is clearly traceable to the lot and residential structure. He illustrates here a legitimate basis for argument that the additional funds, all from White Grain proceeds also originated with him. Those additional items, documented with receipts in all except noted instances, are less clearly traceable so he elects to assert the necessity to set aside $225,000 as nonmarital, and not to do so with the balance.

Keith said the approximate $475,000 in alleged nonmarital White Grain assets before the marriage "could arguably be used to . . . claim . . . a larger amount excluded from the marital estate." Keith stated, however, that "the argument for the greater sum is not presented" and that he "opts for the more conservative, and certain, view to determine the value excluded from the marital estate."

In its decree, the district court disagreed with any claim that $478,587, Keith's share of White Grain's value in 1992, should be set aside as nonmarital. The court found that after Keith bought out his brother's share, all proceeds from the sale of White Grain in 2003 were used to pay off White Grain debts.

Any remaining White Grain assets after that sale were distributed between the parties and were not satisfactorily traced to any current assets or designation of nonmarital property. The court also found that there was a gift to Nancy of one-half of White Grain's remaining value in 2005.

The court noted that Keith cited exhibits 39, 50, 51, 64, and 74 for the alleged tracing of the $225,000 proceeds from the sale of a bin site "assumably owned by White Grain" to the purchase and improvement of the Niobrara House. The court described exhibit 39 as a spreadsheet document prepared by Keith that the court said "does not represent substantive evidence in tracing any funds." Exhibit 64 was another document prepared by Keith "without any reference to value to be attributed to White Grain for purposes of tracing." Exhibit 74 was a document prepared by Keith listing marital and premarital assets, which the court said failed in tracing any of the listed assets to a nonmarital designation. Exhibit 50, explained the court, was simply a warranty deed evidencing the acquisition in 2006 of the Neligh property from White Grain after White Grain was owned by the parties equally due to the gift of stock. Exhibit 51 was an email to Keith's legal counsel stating that $66,500 of White Grain equipment was sold "at the same time as the real estate sale," without indicating when the sale occurred or what sale was being referred to.

In a later motion to alter or amend, Keith explicitly stated he was no longer challenging the court's finding of the gift of one-half of the stock to Nancy. However, he challenged the accounting and asserted the court erred by failing to recognize that his half of White Grain remained his premarital property. Characterizing the error as "mathematical," Keith asserted that White Grain was worth $225,000 and that half, or $112,500, should be awarded to Keith as his nonmarital property. Citing the purported majority view in other jurisdictions, Keith argued that the half gifted to Nancy should be considered marital property and that thus, half of that, $56,250, should also be awarded to Keith as part of equitable division. In

other words, he argued he was entitled to $168,750. The court disagreed, again stating that "none of the evidence supplied by [Keith], or [Nancy] for that matter, allowed the Court to designate any value to [Keith's] non-marital share of White Grain" and that Keith was unable to trace any remaining assets to the value of White Grain.

(c) Inheritance From Father

Keith also sought to have set aside as nonmarital property $340,000 inherited from his father. There was no dispute that Keith inherited land in 2003 or that it was sold in 2006, with Keith's share of the proceeds being $340,000. The district court set off $260,000 as nonmarital property traced from the inheritance to the purchase of Farm 1, noting that Nancy did not dispute that some of the inheritance was used to purchase Farm 1 but testifying that it was, at most, $260,000. In refusing to set aside as nonmarital any additional sum, the court observed inconsistencies in Keith's testimony and the lack of any bank records supporting tracing.

Keith testified at trial that he had placed the inheritance funds into a separate account at Pinnacle Bank, from where he transferred the money to pay for Farm 1. Keith did not provide any bank records of the deposit or the withdrawal. Instead, as evidence in support of tracing the inheritance, Keith again relied on exhibit 39, the spreadsheet presumably prepared by Keith of the "chronological summary of White Grain." Exhibit 39 states that $340,000 came into White Grain in 2006 and that Farm 1 was purchased for $360,000 that same year.

Keith testified that the purchase price for Farm 1 was $380,000 and that because his inheritance did not "quite cover it," he used proceeds from White Grain to pay for the remainder. However, on cross-examination, Keith explained that he and Nancy borrowed money to complete the purchase of Farm 1. He could not recall the amount.

In his pretrial deposition, Keith had testified that he paid for Farm 1 with money he received from his father's estate,

which he thought had been placed in either a Pinnacle Bank or a Genoa National Bank joint account with Nancy, but he also said he was not sure if it was placed in a joint account or in a separate account. During his deposition, Keith agreed with his counsel's suggestion that Farm 1 consumed the entirety of the proceeds from his inheritance from his father.

A Farm 1 deed of trust executed on the same date as the purchase of Farm 1 reflects a promissory note in the amount of $100,000. Keith, at one point at trial, testified he and Nancy used Farm 1 as security to borrow the $100,000, which they used to repair an irrigation pivot that broke sometime after they purchased Farm 1. At another point in his testimony, however, Keith explained they borrowed the money to pay for part of the purchase price of Farm 1 because he had spent some of his inheritance: "Well, I think originally we borrowed the money that I was short to pay — I got the 340,000 from my inheritance and I think the farm was 380 and whether some of that money had gotten away and I needed the 100,000 to complete, that would be my guess."

Keith admitted that, during the marriage, he and Nancy used Farm 1 as collateral to borrow additional sums that were used for marital purposes. One exhibit showed that in 2012, $200,000 was borrowed by Keith and Nancy, using Farm 1 as collateral. Keith originally could not recall what that money was used for, but when his counsel pointed out that in exhibit 39, there was an entry in 2012 for a Niobrara cabin for $271,000 (including improvements), Keith remembered it was to buy the Niobrara cabin. He explained, "I didn't know we borrowed before we sold the Baker bin site." This was after his testimony, set forth above, that the proceeds of the sale of the bin site were directly used to purchase the Niobrara House. Keith testified that, in 2014, he and Nancy borrowed an additional $250,000 against Farm 1 that was used to purchase the house in Neligh. He said this was reflected in two promissory notes in 2014, one for $175,000 and one for $75,000.

Keith's counsel asked Keith to confirm counsel's summary as follows:

> [W]hat happened is you inherited money from your father, you bought Farm 1, you had to put in some money in part because you were a little short, and in part because you had to take out trees and rebuild the pivot when a pivot hit a tree.

Keith said this was generally correct, except that the pivot repair "came after."

Keith affirmed that he and Nancy subsequently used the collateral of Farm 1 to buy both the Niobrara and Neligh Houses. However, Keith described the $250,000 loan, which was long term, as an unofficial bridge loan, "because [he] had to close on the house that [he and Nancy] sold in Neligh and [he and Nancy] didn't have those proceeds yet." Keith testified that when that sale went through, he left the debt on Farm 1 instead of moving it to the new house, explaining that loans on the farm had a more advantageous interest rate. Keith admitted he was not claiming that any of the loans were paid back with nonmarital funds.

Nancy testified at trial that she told Keith he should invest his inheritance in something "because he was going to spend it all and he spent some of it, but I don't recall on what." Nancy testified that $100,000 of the purchase price for Farm 1 was borrowed. She remembered the pivot's breaking but testified that it happened about a year after the purchase of Farm 1.

Nancy testified that Keith did not have an individual checking or savings account and that all accounts were jointly in both their names. She agreed with Keith's testimony that they used Farm 1 to borrow money for other marital purposes during the course of their marriage. They used marital funds to then pay back those loans.

According to Nancy, the first thing Keith and she purchased with borrowed sums using Farm 1 as collateral was the Niobrara cabin. Nancy explained that the cabin was destroyed

after it sat in floodwater for 3 months and they were forced to burn it. They eventually built the current Niobrara House on that same land. Nancy testified there was no insurance coverage for the flood damage. She believed that a second loan was used to pay for the current Niobrara House and that a third loan was taken out on Farm 1 to purchase the Neligh House and renovate it.

### (d) Inheritance From Uncle

The district court denied a claim by Keith to set aside as nonmarital $40,000 allegedly inherited during the marriage from his uncle. As the district court noted, Keith did not address the $40,000 inheritance during his testimony at trial. Instead, he relied on a "Joint Property Statement" submitted as an exhibit by Keith's counsel and not signed by Nancy or her counsel. The court found that the exhibit was not substantive evidence of the existence of an asset, where it was located, or its tracing.

### (e) Order to Sell Farms

In its dissolution decree, the court ordered that Farm 1 and Farm 2 be placed for sale and that the profits be divided equally after deducting the $260,000 that the court found traceable to Keith's inheritance. However, it also permitted the parties to purchase the parcels if one of the parties desired to do so. The court stated:

> In the event that one of the parties desires to purchase either parcel, the sale price shall be the average fair market appraisal value given by three qualified real estate appraisers, or as the parties might otherwise agree. Additionally, neither party, nor any family member, shall act as a broker for these real estate sales or be entitled to any broker's fee, appraisal fee, finder's fee, or any other fee associated with the sale of these properties.

It ordered each party equally responsible for an appraisal fee in the amount of $15,000.

At trial, Nancy initially said she was indifferent about the disposition of the real estate assets, but she later said she wanted the farms sold. In cross-examination, Nancy conceded that if the farms were sold, the federal income tax consequences of the sale would fall equally on Keith and her. Amongst the many exhibits admitted before trial was a copy of the Internal Revenue Code. In a letter to the trial judge before the court entered its decree, Nancy's counsel explained, "Dividing the property in kind would involve less up-front tax liability, but present the conundrum of who should receive the farm interests." She proposed that "[i]f Farm 1 and Farm 2 are to be divided between the parties and not sold, it makes more sense to award Nancy Farm 1, and Keith the one-half interest in Farm 2 in view of the ownership history of that parcel."

In his posttrial brief, Keith asserted that the property values were conceded and that Nancy expressed no preference for any asset and "d[id] not contest that Keith should be awarded the assets he seeks," because "[s]he prefers cash." Keith asked that all real estate be awarded to him. He did not elaborate on the particular reasons why the farms should be awarded to him rather than sold.

In a motion to alter or amend, Keith argued the court erred in ordering the sale of the farms, alleging that their values were undisputed and that Nancy did not want the farms and was indifferent to whether they were sold. The court denied the motion, stating that it was unaware of any stipulation entered into between the parties about who should receive the farms and that Keith was free to purchase the farms upon their sale or enter into an agreement with Nancy that he purchase her interest in the farms at an agreed-upon price.

## III. ASSIGNMENTS OF ERROR

Keith assigns that the district court erred by (1) ordering the parties to sell Farm 1 and Farm 2; (2) finding that Keith failed to trace premarital assets; (3) finding that Keith failed to trace inherited funds; (4) finding that Keith "owned [sic]

one half of the premarital White Grain . . . stock to Nancy but failed to recognize that its assets were largely sold and funds distributed out of the company to Keith, and traced elsewhere when the gift was made"; (5) "[h]aving found the gift of one half of White Grain . . . stock proceeded to divide the remaining one half retained by Keith by treating it as marital, thereby giving 3/4ths to Nancy"; (6) failing to divide debt between parties and concurrently failing to recognize Nancy took funds from one loan and did not account for them; (7) failing to treat debt Keith incurred to pay ordered spousal support as marital debt; and (8) failing to order Nancy to pay costs and fees Keith incurred due to the petition in intervention and trial, "by failure to inquire of [J.E.M.] and [its] CPA about the facts."

## IV. STANDARD OF REVIEW

[1] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees.[1]

[2] On appeal, an appellate court will uphold a lower court's decision allowing or disallowing attorney fees for frivolous or bad faith litigation in the absence of an abuse of discretion.[2]

## V. ANALYSIS

Keith argues on appeal that the district court erred in refusing to award him, in the dissolution action, the attorney fees incurred in the bifurcated trial on the complaint in intervention. Keith also argues the court erred by rejecting his tracing of nonmarital property, finding he had failed to prove a $25,000 outstanding debt from the COVID loan or that Nancy dissipated the loan, failing to consider money borrowed by Keith to

---

[1] *Stava v. Stava*, 318 Neb. 32, 13 N.W.3d 184 (2024).

[2] *Trausch v. Hagemeier*, 313 Neb. 538, 985 N.W.2d 402 (2023).

pay the temporary support order as marital debt, and ordering the sale of the farms.

### 1. Attorney Fees From Intervenor's Action

We find no merit to Keith's argument that the district court erred by disallowing attorney fees associated with Nancy's defending against J.E.M.'s action.

In an attempt to avoid the agreement memorialized in the consent decree that the parties pay their own attorney fees "with respect to [J.E.M.'s] amended complaint in intervention and any matters pertaining thereto," Keith argues that because "Nebraska's statutes authorize fees in dissolution cases, but not intervenor cases," he "never abandoned or waived his right to claim attorney's fees under the dissolution statutes."[3] At the same time, Keith argues that Nancy "had no good faith basis for the position she took,"[4] alluding to § 25-824, which applies to quiet title actions and was cited by Keith below in support of his request for attorney fees.

[3-5] A consent decree is treated as an agreement between the parties and is accorded greater force than ordinary judgments.[5] We find no merit to Keith's argument that he was not bound by the consent agreement in the bifurcated quiet title action simply because he sought the order of attorney fees within the dissolution action. In any event, we find no abuse of the district court's discretion in denying the fees. The term "frivolous" connotes an improper motive or legal position so wholly without merit as to be ridiculous,[6] and any doubt about whether a legal position is frivolous or taken in bad faith

---

[3] Reply brief for appellant at 20.

[4] Brief for appellant at 38.

[5] See *Hoshor v. Hoshor*, 254 Neb. 743, 580 N.W.2d 516 (1998).

[6] *SID No. 596 v. THG Development*, 315 Neb. 926, 2 N.W.3d 602 (2024).

should be resolved in favor of the one whose legal position is in question.[7]

## 2. Division of Assets

[6] Neb. Rev. Stat. § 42-365 (Reissue 2016) provides, in part, that "[t]he purpose of a property division is to distribute the marital assets equitably between the parties." Keith argues the court erred in rejecting his claim that certain assets were his separate, nonmarital property and, thus, were not marital assets to be divided equitably between the parties. The burden of proof rests with the party claiming that the property is nonmarital.[8] For the foregoing reasons, we hold that the trial court did not err in finding that Keith had failed to sustain this burden beyond the $260,000 traced from Keith's inheritance.

[7-9] All property accumulated and acquired by either spouse during the marriage is generally considered part of the marital estate.[9] Property that a party brings into the marriage, which was acquired before the marriage, by gift, or by inheritance, is usually excluded from the marital estate and set aside as separate property.[10] But separate property can become marital property through transmutation when the separate property has been inextricably mixed with marital property or with the separate property of the other spouse.[11] This is as opposed to separate property that remains segregated or traceable into its product.[12]

[10,11] It has been difficult to determine precisely what assets Keith specifically argues the court erred in failing to set aside as products traced from his nonmarital assets. We

---

[7] *Id*.

[8] *Seemann v. Seemann*, 316 Neb. 671, 6 N.W.3d 502 (2024).

[9] See *Stava v. Stava, supra* note 1.

[10] See, *id.*; *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017).

[11] See *id*.

[12] See *Seemann v. Seemann, supra* note 8.

reiterate that, absent plain error, we can consider only errors both specifically assigned and specifically argued in the parties' initial brief.[13] Conclusory assertions unsupported by coherent analytical argument fail to satisfy the requirement that the error be specifically argued.[14]

[12,13] Under the party presentation principle, absent plain error, courts are neutral arbiters of matters the parties present.[15] Thus, we have explained that our requirement that appellants specifically assign and specifically argue any alleged error of the lower court is not to impede appellate review but to facilitate it by preventing the parties from shifting to appellate courts the critical tasks of searching the record for relevant facts, identifying possible trial error, and articulating a legal rationale that supports the assigned error.[16] This ensures that appellees have notice of what matters must be answered, that precedent is not established with inadequate briefing,[17] and that appellate courts do not inadvertently act as advocates instead of arbiters.[18]

Keith's brief presents a series of short, numbered paragraphs, each generally containing a proposition of law, factual assertion, or conclusory sentence. We have tried to piece these paragraphs together into a coherent analytical argument containing legal rationale while being mindful of the principles set forth above. In the longest paragraph, Keith sets out a list of "[a]ssets remaining unchanged"[19] and a list of

---

[13] See *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020).

[14] See *id*.

[15] See *United States v. Sineneng-Smith*, 590 U.S. 371, 140 S. Ct. 1575, 206 L. Ed. 2d 866 (2020).

[16] See *State v. Olbricht*, 294 Neb. 974, 885 N.W.2d 699 (2016).

[17] See *Linton v. Linton*, 117 S.W.3d 198 (Mo. App. 2003).

[18] See, e.g., *Shelton v. Shelton*, 717 S.W.3d 810 (Mo. App. 2025); *Rosier v. State*, 276 So. 3d 403 (Fla. App. 2019); *People v. Spinelli*, 83 Ill App. 2d 391, 227 N.E.2d 779 (1967).

[19] Brief for appellant at 27.

"[a]ssets [b]rought [t]o [m]arriage, [t]raced, [n]ot [i]nextricably [i]ntertwined."[20] These two lists contain citations to approximately 25 exhibits that apparently support the tracing of the listed assets as nonmarital, but the exhibits are not otherwise discussed. The lists are followed by the statement that the district court "erred by giving Keith credit for *none* of the inherited assets and *none* of the traced assets Keith brought into the marriage"[21]—which begs the question which assets Keith truly claims were traceable.

For the sake of completeness, we have reviewed all the items in the lists of alleged nonmarital assets and their allegedly corresponding exhibits, and we agree with the district court that Keith failed to prove the listed assets should be set aside as his nonmarital property. We will more specifically address below the alleged traceability of the premarital White Grain and inheritance assets, which Keith expanded upon.

### (a) White Grain

[14] According to the list, Keith traced his share of the alleged book value of White Grain in 1992, which was $478,578, to $225,000 in proceeds from the sale of the bin site, allegedly invested in the Niobrara House, and he also traced unspecified "[a]dditional White Grain"[22] funds that were used for an additional $367,483 investment in the Niobrara House. But in his posttrial briefing, Keith conceded below that those additional funds were "less clearly traceable so he elects to assert the necessity to set aside $225,000 as nonmarital, and not to do so with the balance." This court has long held that a party cannot complain of error which the party has invited the court to commit.[23]

---

[20] *Id.* at 28.

[21] *Id.* at 30 (emphasis supplied).

[22] *Id.* at 29.

[23] *D&M Roofing & Siding v. Distribution, Inc.*, 319 Neb. 707, 24 N.W.3d 850 (2025).

The district court did not err in finding Keith had failed to trace $225,000 as nonmarital White Grain assets. Aside from the fact that all the alleged investments were made before the First Niobrara House was destroyed by flooding and after White Grain had been dissolved and its remining assets had been placed jointly in Keith's and Nancy's names, there was no persuasive documentary evidence that the bin site was sold for $225,000, let alone that it could be traced to the First Niobrara House. Because of the manner by which the exhibits were entered into evidence, there was little testimony explaining their foundation or relevancy. The apparent deed of sale was for $1. And, standing alone, the unsworn spreadsheets and lists of unknown provenance or prepared by Keith have little evidentiary value.

While Keith testified that the $225,000 from the bin sale was invested in the Niobrara property, he later testified the money for the Niobrara property came from a loan on Farm 1. A spouse can establish tracing through testimony, but a trial court is entitled to find that testimony uncredible,[24] weighing the spouse's self-interest against the evidence, or lack thereof.[25] Keith argues on appeal that his evidence of tracing was uncontradicted. Even if this were true, evidence not directly contradicted is not necessarily binding on the trier of fact and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence.[26] We defer to the district court's determinations as to Keith's credibility.

Keith argues that the district court erred in its treatment of the White Grain stock as a gift by failing to consider White Grain's diminished value at the time of the gift. At the same time, he argues the court erred in failing to divide as marital

---

[24] See *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016).

[25] *Ramsey v. Ramsey*, 29 Neb. App. 688, 958 N.W.2d 447 (2021).

[26] *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019).

the gifted shares while awarding to Keith as nonmarital that half that was not gifted. He does not explain on appeal what sums should have been so divided, but we can only assume, based on the theories presented below, he refers to the alleged $225,000. Because no value can be traced to White Grain, and the court did not award either party any value attributable to White Grain, we find no merit to this argument.

### (b) Inheritances

Keith makes no argument in his initial brief, nor does he indicate in his lists, how the alleged $40,000 inheritance from his uncle is traceable. As for the entirety of the $340,000 inherited from his father (rather than just the $260,000 set aside to him), he asserts the district court was unreasonable because it "apparently wanted cancelled checks and deposit slips."[27] We agree with the district court that none of the exhibits cited prove tracing and that Keith's testimony purporting to trace the entire $340,000 sum to Farm 1 was not credible. The presence of the $100,000 promissory note and Keith's testimony that he and Nancy borrowed the money because some of the inheritance money "had gotten away and [he] needed the 100,000 to complete" the transaction undermine any testimony the entirety of the $340,000 could be traced to Farm 1. Furthermore, there was evidence of multiple loans taken out on Farm 1 and paid off with marital funds during the marriage. The district court was generous in setting aside the $260,000.

### 3. Division of Debt

### (a) COVID Loan

Keith's argument with respect to the COVID loan appears to have two parts: (1) The $25,000 debt remained outstanding and should have been included in calculations, and (2) the debt should have been ordered paid by Nancy because she "did not

---

[27] Brief for appellant at 27.

account for loan proceeds left unpaid."[28] Nancy argues that the court did not err in finding there was insufficient evidence to establish the existence of the loan, let alone that it was wrongfully dissipated. We agree.

[15] The burden of proving the existence of a debt is upon the party who seeks to divide it.[29] Keith and Nancy both testified that a COVID loan was taken out during the marriage. Nancy did not testify regarding whether any balance was still outstanding. Keith testified that there was still $25,000 outstanding and that he was making monthly payments. There was no documentary evidence supporting the existence of the loan.

From the court's decree and order denying Keith's motion to alter or amend, it appears the court had accepted that the parties had taken out the loan but found the loan was paid off. We agree that Keith failed to prove the continued existence of the debt. Keith's testimony lacked detail, and no inquiry was made of Nancy regarding the existence of a remaining balance.

[16] The district court also did not err in finding that Keith had failed to prove dissipation of the loan. Dissipation of marital assets is defined as one spouse's use of marital property for a selfish purpose unrelated to the marriage and at the time when the marriage is undergoing an irretrievable breakdown.[30] Nancy testified the funds from the loan were put into Keith's and her White Realty account and spent on joint expenses in the same way all funds in that account were. Keith testified that he did not know what the loan funds were used for. That is not enough to prove dissipation. There was no evidence that the loan funds were spent by Nancy after the marriage was irretrievably broken.

---

[28] *Id*. at 35.

[29] 2 Brett R. Turner, Equitable Distribution of Property § 6:96 (4th ed. 2024).

[30] *Reed v. Reed*, 277 Neb. 391, 763 N.W.2d 686 (2009).

### (b) Debt for Temporary
### Spousal Support

We find no merit to Keith's assignment that the district court erred by failing to treat debt he incurred to pay spousal support as marital debt to be divided equally. Keith does not assign as error the court's order of temporary support or its order refusing to modify the temporary support order. While Keith provided testimony via affidavit and at trial that he incurred debt in relation to the temporary support order, the court did not find this sufficient to prove that Keith was unable to earn income or pay the ordered spousal support, and we find no error in the court's reasoning.

[17] On appeal, Keith argues that support is a "marital obligation" and that "[h]ad major medical expenses been incurred during the 18 months the case was pending they would have been marital."[31] Apparently, it follows that that temporary support is a marital expense subject to division—or, at least, it is so if the party ordered to pay the support elected to take out loans. We can find no support for this supposition. Moreover, the record does not reflect that Keith actually asked the court to divide the alleged debt as marital property before it issued its decree. We will not consider an argument or theory raised for the first time on appeal, because a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition.[32]

### 4. Ordering Farms Be Sold

[18] Lastly, we address Keith's primary argument, which is that the court erred in ordering Farm 1 and Farm 2 sold rather than awarding them to Keith with an equalization payment to Nancy. A court in a dissolution action may provide for the sale of all or part of the parties' assets in lieu of dividing them, if to do so is reasonable in the light of the facts, the

---

[31] Brief for appellant at 36.

[32] See *Elbert v. Young*, 312 Neb. 58, 977 N.W.2d 892 (2022).

circumstances of the parties, and the nature of their property.[33] Such action, of course, must be within the statutory dictate that the division of the assets be reasonable, having regard for the circumstances of the parties as provided in § 42-365, and that it satisfy the ultimate test of fairness and reasonableness articulated by case law.[34]

The sale of parties' marital assets is generally not the favored method of disposing of property in a dissolution action, and that is especially so when it comes to farmland.[35] The Court of Appeals in *Kellner v. Kellner*[36] found that there were not that many cases in Nebraska where the sale of assets was ordered in dissolution decrees, stating, "The lack of dissolution cases where a sale of assets was ordered is itself an indication of the general hesitancy of at least Nebraska courts to force divorcing people to sell their property."

In *Kellner*, the Court of Appeals reversed the district court's dissolution decree ordering the sale of, among other things, all the parties' land, livestock, and farm equipment and ordering that the proceeds be divided between the parties. There was extensive evidence of the value of the property. The parties had farmed their land during the marriage but, several years before the dissolution, had leased it to a third party. However, the husband continued to farm on other people's land and care for livestock on both the parties' and other people's land. The Court of Appeals said, "In an agrarian state such as Nebraska, people who are associated with agriculture generally regard the continued ownership of land as very important."[37] Thus,

---

[33] *Kellner v. Kellner*, 8 Neb. App. 316, 593 N.W.2d 1 (1999).

[34] *Id*.

[35] See *id. (*and cases cited therein).

[36] *Id*. at 332, 593 N.W.2d at 12. See, also, 3 Brett R. Turner, Equitable Distribution of Property § 9:13 (4th ed. 2024). See, also, Annot., 9 A.L.R.5th 568 (1993).

[37] *Kellner v. Kellner, supra* note 33, 8 Neb. App. at 333, 593 N.W.2d at 12.

the court stated, "It is not reasonable for a court in a dissolution action to unnecessarily interfere with the respective desires of the parties and their way of life."[38]

The Court of Appeals also pointed out that "[c]ourts must be aware of the general effect of income tax laws."[39] The court in *Kellner* elaborated: "Improvements on the land and farm machinery depreciate for income tax purposes. The taxable income is realized upon the sale of such depreciable property. For this reason, it would be foolish to sell all the land, machinery, and equipment without good reason."[40] Noting that the lower court was well aware of the tax consequences of the sale it was ordering, the Court of Appeals said, "For a court to force one or both parties to incur substantial income tax liability by a forced sale is unreasonable, unless the sale is necessary to accomplish a reasonable and necessary division."[41] The Court of Appeals said it could not fathom, given the evidence of values, why the lower court did not allow the husband to take the property at those values.

The facts of this case are distinguishable from those presented in *Kellner*. The parties were not, as Keith contends, in agreement as to whether the farms should be sold, and from the record, we do not see that Keith adequately argued to the district court that tax disadvantages necessitated an award and equalization in lieu of a sale. While Nancy did not dispute the farms' valuations as of 2022, those values could have changed significantly in the 2 years hence. And the assets tied up in the two farms were a significant portion of the overall marital estate, such that Keith would likely have to obtain financing to satisfy any equalization payment. Retaining the farms was not necessary to retain Keith's agrarian way of life.

---

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.* at 333, 593 N.W.2d at 13.

In the event Keith wanted to retain the farms, the court gave Keith the option of purchasing them for a fair market value as established in the manner set forth in the decree. We are cognizant of the fact that one-half of Farm 2 was owned by J.E.M.; thus, only half of Farm 2 was part of the marital estate.[42] However, at no point in the proceedings did J.E.M. object to a possible sale of Farm 2 as part of the court's property division. And J.E.M. has not attempted to appeal the order to sell Farm 2. The court did not err by ordering the farms sold.

VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

─────────────

[42] See *Bolduc v. Bolduc*, 301 A.3d 771 (Me. 2023).