Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/17/2026 08:10 AM CDT

Justin Avery, appellant, v.
Amy Whittle, appellee.
___ N.W.3d ___

Filed March 17, 2026.    No. A-25-373.

1. **Divorce: Appeal and Error.** In a marital dissolution action, an appellate
   court reviews the case de novo on the record to determine whether there
   has been an abuse of discretion by the trial judge.
2. **Child Custody: Child Support: Property Division: Alimony: Appeal
   and Error.** An abuse of discretion standard of review applies to the
   trial court's determinations regarding custody, child support, division of
   property, alimony, and attorney fees.
3. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the
   reasons or rulings of a trial judge are clearly untenable, unfairly depriv-
   ing a litigant of a substantial right and denying just results in matters
   submitted for disposition.
4. **Child Custody.** When deciding custody issues, the court's paramount
   concern is the child's best interests.
5. ____. A trial court must consider the factors set forth in Neb. Rev. Stat.
   § 43-2923(6) (Reissue 2016) when making determinations about the best
   interests of a child, in the context of custody.
6. ____. In determining the best interests of a child in a custody determina-
   tion, a court must consider pertinent factors, such as the moral fitness of
   the child's parents, including sexual conduct; respective environments
   offered by each parent; the age, sex, and health of the child and parents;
   the effect on the child as a result of continuing or disrupting an existing
   relationship; the attitude and stability of each parent's character; and
   parental capacity to provide physical care and satisfy educational needs
   of the child.
7. ____. In determining the best interests of a child in a custody deter-
   mination, no single factor is determinative, and different factors may
   weigh more heavily in the court's analysis, depending on the evidence
   presented in each case.

8. **Child Custody: Words and Phrases.** Under the Parenting Act, the concept of child custody encompasses both physical custody and legal custody, with legal custody focusing entirely on decisionmaking authority.

9. **Child Support: Rules of the Supreme Court.** In general, child support payments should be set according to the guidelines established pursuant to Neb. Rev. Stat. § 42-364.16 (Reissue 2016).

10. ____: ____. Neb. Ct. R. § 4-212 (rev. 2011) is applicable when the threshold amount of parenting time is met, even if no specific provision for joint physical custody is ordered.

11. ____: ____. The Nebraska Child Support Guidelines offer flexibility and guidance, with the understanding that not every child support scenario will fit neatly into the calculation structure.

12. ____: ____. Pursuant to Neb. Ct. R. § 4-203(C) (rev. 2020), a deviation from the Nebraska Child Support Guidelines is permissible if total net income exceeds $20,000 per month.

13. ____: ____. Neb. Ct. R. § 4-203 (rev. 2020) requires either an explanation for an upward deviation from the Nebraska Child Support Guidelines or the completion and filing of worksheet 5 from the guidelines.

14. **Divorce: Property Division.** Equitable division of property is a three-step process. The district court (1) classifies the parties' property as marital or nonmarital, setting aside nonmarital property to the party who brought the property to the marriage; (2) values the marital assets and marital liabilities of the parties; and (3) calculates and divides the net marital estate between the parties in accordance with the principles contained in Neb. Rev. Stat. § 42-365 (Reissue 2016).

15. ____: ____. The extent to which property is marital versus nonmarital presents a mixed issue of law and fact. The manner and method of acquisition involve questions of fact, but the classification of the property under those facts is a legal question and not a matter of the court's discretion.

16. ____: ____. All property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to this general rule.

17. ____: ____. Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital while another portion can be separate property.

18. **Divorce: Property Division: Real Estate: Proof.** Whether appreciation in real estate is active or passive depends on the facts and circumstances of each case. In that regard, evidence relating to the cause of appreciation is key, and the burden is on the owning spouse to prove

the extent to which marital contributions did not cause the appreciation or income.

19. **Evidence: Proof.** Unless an exception applies, the burden of proof in civil cases requires only a greater weight of the evidence. The greater weight of the evidence means evidence sufficient to make a claim more likely true than not true.

20. **Property: Equity: Title.** The acquisition of property can be an ongoing process. It occurs only as it is paid for, as the real value of property is the equity and not the mere legal title.

21. **Divorce: Property Division.** Under the "source of funds" rule, acquisition of encumbered property only occurs when and to the extent it becomes unencumbered by paying off the principal of an encumbering loan during the marriage.

22. **Divorce: Property Division: Mortgages.** The use of marital funds to pay down the mortgage on what was initially separate property acquires the property during the marriage to the extent the principal is paid, creating a proportionate marital interest in that property.

23. **Divorce: Property Division: Equity.** Because the proportion of the property's equity created during the marriage with marital funds constitutes marital property, the appreciation on that equity, whether it be passive or active, is also marital property.

24. **Divorce: Property Division.** When acquisition occurs via payments on the principal of encumbering debt, the marital estate receives not just a refund of the monetary contribution toward the principal of the loan, but also a fair return on its investment, which includes passive appreciation.

25. **Divorce: Property Division: Mortgages.** A trial court is to divide the passive appreciation proportionately between the marital and separate interests if marital funds were used to pay down the principal of a mortgage for property that appreciates during the marriage due to passive market forces.

Appeal from the District Court for Douglas County: TRESSA M. ALIOTH, Judge. Affirmed.

Liam K. Meehan, of Higgins Law, for appellant.

Benjamin M. Belmont and Mariah E. Shaffer, of Brodkey, Cuddigan, Peebles, Belmont & Line, L.L.P., for appellee.

Moore, Bishop, and Welch, Judges.

Bishop, Judge.

## I. INTRODUCTION

Justin Avery (Justin) appeals the Douglas County District Court's decree, as amended, that dissolved his marriage to Amy Whittle (Amy). He challenges the district court's decisions relating to custody and parenting time of their three children, child support, and certain determinations regarding marital property. We affirm.

## II. BACKGROUND

After obtaining an undergraduate degree, Amy joined the U.S. Air Force and enrolled in its "health professional scholarship program." She graduated from medical school in 2014 and began her "active duty service" at Offutt Air Force Base in Nebraska for 3 years. She met Justin "online" in August 2016. Justin was a "[c]onfiguration analyst" for a company when he and Amy met.

In 2017, Amy became a "board certified" practitioner in family medicine. After she received orders to a military base in New Mexico, the couple married in June and moved there together. Justin was able to keep his employment with the same company. In 2021, they moved back to Nebraska when Amy was honorably discharged from her military service. The parties had three children: Holden Avery, born in 2019, and twins Jude Avery and Eleanor Avery, born in 2021.

### 1. Pleadings

On May 16, 2023, Justin filed a complaint for dissolution of marriage in the district court, seeking joint legal and physical custody of the parties' children, spousal support, and an equitable division of property and debts. Amy filed an answer denying Justin's contentions regarding child custody and spousal support. She also counterclaimed, seeking full custody of their children.

## 2. Temporary Order

In July 2023, the district court entered a temporary order awarding the parties joint legal and physical custody of their children. Justin had the children on Tuesdays and Wednesdays, Amy had them on Mondays and Thursdays, and the parties alternated parenting time on the weekends, beginning on Fridays. Amy was later temporarily ordered to pay child support in the amount of $657 per month, and the court allocated childcare costs and other expenditures "reasonable and necessary" for the benefit of the children. Justin and Amy were also prohibited from consuming alcohol during their respective parenting times.

## 3. Trial

Trial began on October 30, 2024, continued on October 31, and concluded on March 12, 2025. We summarize the evidence pertinent to the issues on appeal.

### (a) Child Custody

Justin requested joint legal and physical custody of the children. He testified that he would be "okay" if the district court adopted the terms of the temporary order but indicated that he "prefer[ed] less handoffs," suggesting a "typical 2-2-3 split." He believed this plan would be in the best interests of his children because "[w]ith fewer handoffs, there's fewer gaps," and the children's personal items were less likely to be forgotten or lost.

Amy opposed any joint custody arrangement and sought sole legal and physical custody of the children. In support, she cited Justin's history of limited caregiving experience; his struggle with substance abuse; his abusive language and behavior; and his general unwillingness to agree on extracurricular activities, schooling, and medical care for the children.

### (i) Parenting History

Amy became pregnant with the parties' first child after the couple relocated to New Mexico. It was a "traumatic birth"

that left her in "a lot of pain," which included a "massive post-partum hemorrhage." Although Justin had "somewhere around six to eight weeks" of paternity leave, he used only "a few" days of leave to assist with their new child.

Amy testified that Justin was "[v]ery little help" when Holden was born. There was one instance where she "just couldn't get out of the bed" to nurse Holden due to postpartum pain. When she asked Justin to retrieve their son, he "yelled" at her and told her it "wasn't his problem." According to Amy, Justin began to take sleeping pills at night, and he eventually moved into a guest bedroom to avoid being awakened by the baby's crying. When asked if Justin helped "at all," Amy responded that he would get "so frustrated" by being awakened to help that she stopped requesting assistance, but she acknowledged that he did bathe Holden "occasionally." Although Justin worked from home, Amy would drop Holden off at daycare at 7 a.m., return to the facility at noon to nurse him, and pick him up around 5 p.m. Upon arriving home, she would "wear him" while preparing dinner. She "[s]ometimes" asked Justin to watch Holden while she cooked but eventually stopped because Justin would put in earplugs and leave Holden to cry.

Amy indicated that Justin did not "participat[e] in the family." Instead, he would stay at home, play video games, or catch up on work. Amy's father visited "several times" when they lived in New Mexico. He testified that Justin "never was very involved," did not eat dinner with the family, and would "stay[] to himself."

Amy became pregnant with twins in December 2020. She was honorably discharged from the U.S. Air Force in 2021, and the parties moved back to Nebraska. Amy said that Justin was "significantly less active" during her second pregnancy. When she showed Justin a picture of the twins' first ultrasound, he replied, "'What does it matter? They'll be dead in a few weeks.'" Upon moving back to Nebraska, Amy was placed on "bed rest," but Justin demanded that she unpack,

stating "he didn't care about [her] excuses." After the twins' birth, they were placed in the "NICU" for 22 days. Although Justin was present for their birth and a "couple days after," he only visited the twins another "two or three times" during the 22-day timespan. Amy was at the NICU "every day" from "11 to 7" to nurse the twins. Her parents watched Holden when she was at the hospital with the twins because "Justin was working."

When the twins were brought home, Justin "pretty much stayed in the basement" and only came up "occasionally." Amy's parents helped care for the parties' three children until the end of September 2021. Once her parents departed, Amy "tried to get [Justin] to help a little bit more," but she became "worried" after he struggled to appropriately mix the twins' "preemie" supplements. Justin continued to reside in the basement "by his own choice." Amy began working at a hospital in December 2021 and continued her work as a healthcare provider at the time of trial. Her daily routine consisted of getting the children dressed, taking them to daycare, returning at noon to nurse the twins over lunch, picking them up in the afternoon, and going home to cook dinner. At first, Justin helped Amy dress the twins in the mornings, but his aid eventually "trailed off."

Once Justin filed the complaint for dissolution and the district court entered the temporary order, he began to exercise more consistent parenting functions. Justin explained that caring for the children "was a challenge for everybody at first," but it had "gone really well since then." While the children were in his care, they would "do a lot of stuff outside," "go to the park," and read bedtime stories together. On a typical day under the temporary order, he got the children up at around 7 a.m., dressed them, dropped Holden off at school, took the twins to daycare, and picked everyone up later in the afternoon. Justin claimed that he had never been late picking up the twins from daycare. Justin's sister, Catherine Hutchinson (Catherine), testified that Justin was "a good dad" and that the

children enjoyed being around him. Similarly, Justin's brother opined that he was a "very involved" father.

Amy, however, expressed various concerns about Justin's ability to provide proper care for the children. She noticed the children would return from his custody with matted hair, with unbrushed teeth, and without being washed or bathed. There were also issues surrounding dressing the children in "appropriately sized clothing." Amy indicated that Eleanor, in particular, "would come back in clothes that didn't cover her belly or pants that didn't cover her ankles." Amy admitted that neither daycare nor school staff ever contacted her about hygiene-related issues, but "[a] couple" of daycare workers made comments about how the children were dressed. According to Amy, these workers remarked, "'Oh, we know when it's dad's day.'" Amy also expressed concerns about how Justin transported the children in car seats that were not suitable for their height and weight. When she sent him a message informing him of the need to switch car seats, he responded, "'Don't send me messages like this.'"

Regarding medical care, Justin did not schedule any of the children's medical appointments prior to the dissolution proceedings. According to Amy, he only took an interest in attending appointments after the case was initiated. The district court received a letter authored by the children's Omaha, Nebraska, pediatrician. The letter showed that as of June 26, 2023, Justin had attended none of Holden's 11 medical appointments. The twins had a total of 17 visits between the two of them, and Justin attended only 2 visits. However, according to the document, there were a total of three appointments among the twins where the pediatrician "didn't have documentation [of] which parent attended."

Under the temporary order, the parties had difficulty communicating about and agreeing on medical care. Justin explained that Eleanor had an ear infection for the "entire month" of December 2023. He took her to urgent care because she was "in so much pain for so long." The doctor prescribed

her an oral antibiotic, and Justin administered it "for a day-and-a-half." Justin admitted he did not inform Amy about the appointment until 36 hours later and admitted that he "made a mistake." According to Amy, Eleanor had ear tubes, so ear infections were to be treated with "Ciprodex drops." She stated oral antibiotics were to be avoided because they caused "resistance," especially when "a child [has] reoccurring ear infections." Justin, however, introduced a medical note authored by Amy's coworker. The note stated Amy had "'contacted [him] with concerns about antibiotics prescribed'" during a recent doctor visit. He "[a]dvised" to take the oral antibiotic "as prescribed," along with the drops. When confronted with this note during her testimony, Amy stated she had talked to the coworker generally about Eleanor, was not seeking a medical opinion, and "had no idea he was writing anything in the chart." This coworker never saw Eleanor as a patient.

Another situation in October 2023 involved a disagreement about counseling for Holden. At that time, Justin and Amy met with Holden's pediatrician who suggested that he see an individual counselor to address "difficult" "transitions." According to Amy, Justin agreed to counseling during the visit, but he sent a subsequent message, saying, "'I explicitly refuse to allow you to have our son see a counselor.'" The record does not disclose why Justin refused to consent. The district court also received a document authored by Holden's pediatrician outlining Holden's "5 Year Well Care" visit that occurred in March 2024. The pediatrician wrote that Holden was "doing well" and "adjusting" to time at two houses, but that he "sometimes" becomes "a little sad to change houses" "at the end of [a] long chunk of time." The pediatrician suggested that a counselor "could help" if adjustment challenges continued.

Justin and Amy also struggled to make mutual educational decisions for Holden. Amy stated that she began to look for homes in Elkhorn, Nebraska, prior to moving back from New Mexico. The parties had been looking at Elkhorn because it

was "the top-rated school district" in Nebraska. Once Justin initiated dissolution proceedings, however, the pair could not agree on a school for Holden. According to Amy, Justin wanted their son to attend "[t]he school where he live[d]," while Amy sought to place Holden at an elementary school in Elkhorn. This disagreement led Amy to file a motion and obtain a court order granting her permission to register Holden at the school in Elkhorn.

In a similar vein, prior to the filing of the complaint for dissolution, Justin and Amy disagreed on the educational future of the twins. Amy wanted the twins to attend "transitional kindergarten" or a "third year of preschool," and Justin preferred they start kindergarten early to "save [the parties] a year of daycare." This troubled Amy "because statistics show[ed] children do better when they are not pushed into elementary school early."

Amy called several witnesses who testified to her parental capacity. A childhood friend stated that the children are "always well-loved," "well-fed," "well-bonded," and "very happy and content" when they are with Amy. The friend described her as "a very patient parent" who "really cares about the children" and "goes above and beyond." A former patient testified that Amy is "really good" with the children, "attends to their needs," and "is able to calm them down when they're upset." Justin said Amy was "a great mom most of the time."

### (ii) Justin's Substance Abuse

Another major topic at trial was Justin's purported struggles with substance abuse. Amy testified that Justin "drank [alcohol] nightly," although she admitted the amount consumed "varied" throughout the marriage. She claimed Justin's alcohol consumption increased "significantly" after the couple moved to New Mexico. In a February 2018 text message, Justin wrote to Amy: "I seriously need to stop getting drunk every single night." After the birth of Holden in 2019, Justin continued to drink "nightly," but Amy indicated that he "cut

back on how often he got drunk." Amy's father also observed Justin consume alcohol "pretty much every evening" when he and his wife visited the couple in New Mexico.

Amy offered exhibit 87, a 49-page compilation of photographs taken at the parties' marital residence in the months leading up to the commencement of dissolution proceedings. The pictures show Justin performing various parenting functions, such as bathing the children and changing their diapers. Clear glasses of whiskey, which Amy called Justin's "drink of choice," were either in his hand or nearby. Other pictures depict alcoholic drinks around the home, including on a child's nightstand. Amy testified that Justin eventually noticed her taking the photographs and began "hiding" his alcohol and pouring drinks into opaque coffee cups. When confronted with the photographs at trial, Justin explained that the beverages illustrated were "daddy drinks," which he described as "[a]ny drink that the kids can't drink." Justin claimed the photographs did not accurately demonstrate how he parented his children, but he also "didn't see anything wrong with having a drink." The "only time" he would have alcohol was "right before bed."

Throughout the marriage, Amy "begged" Justin to seek treatment for alcohol abuse; she thought Justin was an alcoholic. Amy "remain[ed] concerned" about Justin's alcohol use and indicated it "was a primary reason" for the parties' separation.

Amy also adduced evidence showing Justin attempted to obtain unprescribed painkillers. She offered an October 2021 text message from Justin that asked, "Can I have an oxy?" Justin stated he did not remember sending the message. Amy's father testified that while visiting the couple after the twins' birth, he observed Justin approach his daughter and insist that she ask the doctor for a second prescription of OxyContin. Although Amy refused, Justin "kept . . . bugging her about it."

Justin contested Amy's characterization of his alcohol consumption. He testified that he had no criminal convictions for driving under the influence. Amy also conceded that daycare employees never reached out with concerns about Justin's alcohol intake, but Justin did state that he used to keep a "breathalyzer" in his car because he "was very responsible." During cross-examination, Justin's sister, Catherine, initially indicated that she never had concerns about Justin's alcohol consumption and denied ever discussing the topic with him. However, the district court received, over a hearsay objection, various text messages between Justin and Catherine. Amy apparently accessed these messages one night after moving back to Nebraska by searching through Justin's phone after he "passed out drunk." In a text exchange between Catherine and Justin that occurred in October 2020, Catherine recounted a conversation she had with Amy:

> [Amy] started out by saying that you were drinking a lot and that you weren't coming out of your room and you weren't eating for days and I sort of believed that. Because I was worried that with Covid and you guys not really knowing anybody down there that maybe you were in fact like in a deep depression and needed help.

Justin, in reply, said the "first part . . . was true." In another unrelated message, Catherine encouraged Justin to "stop drinking." On redirect examination, Catherine provided context for her October 2020 conversation with Justin, explaining that the message was sent around the time that their "mother was very sick and dying." Catherine believed this contributed to Justin's "depression." Justin's younger brother testified that he had not seen Justin ingest alcohol in "a couple years" and had never been concerned about his use of alcohol.

### (iii) Abusive Language and Behavior

Amy made passing references to Justin's use of "abusive language." She said this language made it difficult to coparent effectively under the temporary order. She also said that

their "son" reported "dad yell[ed] at him a lot." While Amy did not provide any concrete examples of the language used, she identified it as one of the reasons why she believed joint legal and physical custody of the children would not be in their best interests.

Amy did, however, recount a December 2022 incident where Justin attempted to "digitally penetrate" her in front of the children. According to Amy, this occurred while she was playing a board game with the children before bed. Justin entered the room with "a drink in his hand" and tried to "move aside" her robe:

> [Amy:] I — well, the first time I said, "Stop, what are you doing?" So he tried again. I yelled, "Stop." I was trying to, like, do it in a way that wasn't super upsetting for the kids. He did it a third time, and I said stop again, and I grabbed his arm and moved it away, and he cursed at me and stormed off.

After putting the children to bed, Amy went to the basement and confronted Justin. She emphasized to him the importance of "set[ting] boundaries regarding [her] body, especially in front of the children." Justin responded by "screaming."

Holden heard the commotion and went to the basement. Justin "grabbed" Holden, "picked him up by his head," took him to the basement bathroom, and locked himself and Holden inside. Amy "begged" Justin to let Holden leave the bathroom and threatened to call the police. Justin eventually let Holden out, but Amy never contacted law enforcement. She "didn't want the kids to see that happen to their father." The next day, Justin sent Amy a text message, saying she could not "talk to him like that again." Amy identified this incident as a "turning point" that made her realize the marriage "wasn't going to be sustainable."

### (iv) Extracurriculars

A large portion of Justin's testimony at trial concerned Amy's purported deception and general lack of communication

surrounding the children's extracurricular activities. In his opinion, this behavior showed that Amy did not "prioritize[] [the] children's wellbeing above everything else."

While operating under the temporary order, the parties communicated through the parenting application "Our Family Wizard." Justin stated that he would "send a lot of messages" to Amy through the application and frequently requested that she add the children's events to a "shared calendar." However, according to Justin, she failed to respond to messages in a timely manner and described the shared calendar feature as too "cumbersome." This led to "a number of times" where Justin showed up to an activity to find that Amy had canceled. Justin also testified that Amy deceived him by taking the children to activities after telling him they were canceled.

During her testimony, Amy disputed most of Justin's claims. She stated that Justin would not allow the children to participate in extracurriculars during his parenting time. Instead, he used the activities as a bargaining chip to affect the outcome of the dissolution proceedings. Amy provided one example where she tried to enroll the children in swim lessons, but Justin refused unless she "dismissed the custody case." Amy also believed Justin's demands regarding Our Family Wizard were excessive. Over a 15-month span, Amy received "nearly 900" messages from Justin. In her opinion, messages through the application "need[ed] to only pertain to the children," and her conversations with Justin often "deviate[d]" from that subject. Amy did not believe the shared calendar was "particularly helpful" because Justin expected her to put all events on the calendar.

### (b) Castelar Circle Home

Prior to the marriage, Justin purchased a home on Castelar Circle (Castelar) in Omaha. The parties lived in the Castelar residence for "a few months" before moving to New Mexico. During the couple's 4-year stay in New Mexico, Justin rented out the Castelar property. According to Justin, rental income

was deposited into his checking account, and he continued to make mortgage payments on the property. When Justin and Amy eventually moved back to Nebraska in 2021, they lived together in the Castelar residence until dissolution proceedings were initiated in 2023.

Both parties agreed that improvements were made to the Castelar home during their marriage. According to Amy, the Castelar residence received new windows, a garage door, a heating and cooling system, a new roof, a shed, and carpet. Justin agreed that new windows and a shed were installed, along with "other improvements." When asked if these improvements increased the value of the residence, Justin refused to answer, stating he would "defer to the appraiser." He did not identify when these improvements occurred nor disclose the amount of money spent on them.

The district court received three separate appraisals of the Castelar residence without objection. According to the documents, the home was valued at $178,000 at the time of the parties' marriage in 2017, $230,000 at the time the parties moved back from New Mexico in 2021, and $285,000 a few months after dissolution proceedings were initiated in 2023. Justin also offered corresponding mortgage statements to calculate the amount of home equity. The first, dated July 2, 2017, listed the outstanding mortgage balance as $87,098.65. The second, dated July 1, 2021, showed an outstanding balance of $57,963.24. The last, dated August 1, 2023, reflected an outstanding balance of $41,534.18.

### (c) Escrow Funds

Justin testified that Amy received $2,364.37 in an escrow overpayment. At trial, Justin offered a June 2023 "Escrow Review Statement." Under a section labeled "Escrow account history," the same amount was reflected next to a description titled "USAA" from May 2023. According to Justin, Amy had promised to reimburse him in a text message but had not done so at the time of trial.

Amy admitted that she "received some money from USAA" in August 2023, but due to multiple insurance refunds at the time, she "didn't realize what they were for" until the following June when Justin "realized he was short in escrow." She could not remember the amount received. The parties had a conference call with USAA, but the issue was not resolved. Amy conceded that the escrow money was accumulated during the marriage and agreed that she had "no problem" with paying Justin half.

### 4. District Court's Decree

On April 18, 2025, the district court entered a decree dissolving the parties' marriage. The court awarded Amy sole legal and physical custody of the parties' three children. Regarding legal custody, the court specifically cited the parties' inability to agree on a school for Holden, the parties' disagreements over whether Holden should see a counselor, Justin's refusal to allow the children to participate in certain extracurricular activities, and his lack of transparency in communications surrounding the children's medical care. Regarding physical custody, the court found Justin returned the children to Amy in an "unke[m]pt" condition, found the medical care provided by him was "concerning," and noted his failure to appreciate the necessity of putting the children in appropriately sized car seats. Justin was granted parenting time every Thursday from 9 a.m. to Friday at 9 a.m. and every other weekend from Thursday at 9 a.m. to Monday at 9 a.m. The court also ordered Justin to pay $1,159 per month for child support. The court used two worksheets to calculate this amount: "Worksheet 1 – Basic Income and Support Calculation" and "Section 4-203(C) Additional Support Calculation (Optional)."

The district court also divided the various assets and debts of the marital estate. Relevant to this appeal, the court determined there was a total of $243,466 in equity in the Castelar property. It allocated $90,901 to Justin for his premarital equity, which involved using the 2017 appraised value ($178,000 at

time of marriage) and subtracting the mortgage balance at that time ($87,099). This left $152,565 in marital equity. According to the court, Justin "failed to meet his burden of proof" that "any appreciation to the real estate was not the result of active appreciation." The court's decree did not include any mention of the escrow funds discussed at trial.

Justin filed two motions seeking to alter or amend the decree. The district court entered an order altering some of the language of its original decree; none of those amendments are pertinent to the issues presented to us for disposition.

Justin appeals.

## III. ASSIGNMENTS OF ERROR

Justin assigns, restated and consolidated, that the district court erred (1) in its decision on custody and parenting time, (2) in its calculation of child support, (3) in its determination of marital equity in the Castelar property, and (4) in failing to include the escrow refund received by Amy in the marital estate and assigning it a value.

## IV. STANDARD OF REVIEW

[1,2] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Seemann v. Seemann*, 318 Neb. 643, 18 N.W.3d 118 (2025). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.*

[3] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## V. ANALYSIS

### 1. Child Custody and Parenting Time

Justin first takes issue with the district court's custody and parenting time decisions. He asserts the court erred in

changing the "50-50 custody" under the temporary orders to a "nine to five custody share" and in "removing joint legal custody." Brief for appellant at 25. For the following reasons, we cannot say that the court abused its discretion in deciding these issues.

(a) General Principles of Law

[4,5] When deciding custody issues, the court's paramount concern is the child's best interests. *Kee v. Gilbert*, 32 Neb. App. 1, 992 N.W.2d 486 (2023). A Nebraska statute provides that in determining custody and parenting arrangements,

> the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member. . . .; and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Neb. Rev. Stat. § 43-2923(6) (Reissue 2016). A trial court must consider the above statutory factors, at a minimum, when making determinations about the best interests of a child, in the context of custody. See *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020).

[6,7] Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result

of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. See *Kee v. Gilbert, supra.* No single factor is determinative, and different factors may weigh more heavily in the court's analysis depending on the evidence presented in each case. *Jones v. Jones, supra.*

(b) Physical Custody and Parenting Time

Justin claims the district court "abused [its] discretion in failing to properly weigh best interest factors in favor of an award of joint physical custody." Brief for appellant at 25. He points to evidence in the trial record that, in his opinion, supports an award of joint physical custody. However, the crux of Justin's argument centers on the fact that the court, in its decree, marginally reduced his parenting time when compared to the temporary order. According to Justin, his "parenting proposal would have awarded him one more week day [sic] every week than the current order" and allowing him an additional day per week would "not detrimentally affect the minor children's best interests." *Id.* at 27.

Under the district court's temporary order, the parties were awarded joint physical custody. However, in the decree, the court accepted Amy's proposed parenting plan and awarded Justin parenting time every Thursday from 9 a.m. to Friday at 9 a.m. and every other weekend from Thursday at 9 a.m. to Monday at 9 a.m. It explained:

The Court granted joint physical custody on a temporary basis during which time [Justin] returned the minor children to [Amy] unke[m]pt. [Amy] testified the children would return smelly, not having been bathed, not having brushed their teeth and being dressed in inappropriate size [sic] clothing. These are essential basic needs for all children. In addition, the medical care for the children while in [Justin's] care is concerning. Lastly, [Justin]

does not find it necessary to put the minor children in appropriate sized car seats.

Justin contends that Amy's testimony regarding the children's hygiene was "not corroborated by third parties" and that neither daycare nor school employees ever voiced any concerns about the issue. Brief for appellant at 26. He also cites "medical notes" offered at trial that contradict Amy's allegations regarding deficient medical care. *Id.* However, the district court clearly found Amy's testimony credible regarding the children's hygiene while in Justin's care, and we, accordingly, give weight to its assessment. See *Scott v. Scott*, 319 Neb. 877, 25 N.W.3d 439 (2025) (when evidence is in conflict, appellate court considers and may give weight to fact that trial court heard and observed witnesses and accepted one version of facts rather than another). Likewise, for reasons elucidated later in our discussion on legal custody, we cannot say the court abused its discretion in factoring this evidence in its decision regarding custody and parenting time.

Justin also takes issue with the district court's reduction of his parenting time. He claims it is not justifiable or supported by the evidence. However, the record reflects that Amy had taken on most of the parenting responsibilities for the children throughout the parties' marriage. Despite largely working remotely during the marriage and having a "pretty flexible" work schedule, Justin did not assist in transporting the children to and from daycare, nor did he meaningfully care for them at home in the evenings. After Holden's birth, Justin watched him on a few occasions but simply put in earplugs and let him cry. Similarly, when the twins were born, Justin, "by his own choice," segregated himself from the family and moved to the basement. This left Amy to exclusively care for their three children. Justin counters, pointing to the fact that he provided a stable housing environment for the children and tended to their educational needs. However, this change in behavior only occurred after the complaint for dissolution was filed and Amy sought sole physical custody of the children.

The trial record also raises concerns related to Justin's struggle with substance abuse. Amy testified that Justin consumed alcohol nightly, which frequently caused intoxication. A compilation of photographs received by the district court depicts Justin performing parenting functions with a clear glass of whiskey either in his hand or nearby. One picture even shows an unattended glass on a child's nightstand. These photographs were taken over the months leading up to the couple's separation. Text messages received by the court also demonstrated Justin pressured Amy to obtain unprescribed painkillers for him. While not mentioned by the court in its decree, Amy testified to a disturbing December 2022 incident where Justin, with "a drink in his hand," attempted to "digitally penetrate" her in front of the children. When she confronted him about it later in the evening, he responded by "screaming." This attracted the attention of Holden, and Justin "picked him up by his head," took him to the basement bathroom, and temporarily locked himself and Holden inside. Although the district court did not make specific findings regarding Justin's struggle with substance abuse or the incident with Amy in front of the children, the court found Amy's testimony to be credible and afforded it considerable weight, and upon our de novo review, we do the same.

Notwithstanding the concerning behavior recounted above, the district court only minimally reduced Justin's parenting time compared to the temporary order. Upon our de novo review of the trial record, we cannot say the court abused its discretion regarding physical custody or parenting time.

### (c) Legal Custody

Justin next argues the district court erred "in removing joint legal custody from the parties." Brief for appellant at 28.

We first observe that Justin's main contention regarding legal custody is that the district court "misplaced" its reliance on this court's decision in *Janda v. Janda*, 32 Neb. App. 953, 9 N.W.3d 212 (2024) (coparenting problems included acts of

deception). Brief for appellant at 29. However, in its decree, the court cited *Janda* only twice, each time to articulate general principles of law common to all cases touching upon child custody. It was not comparing the facts in *Janda* to those present here. We therefore disagree with Justin's assertion that the "trial court's reliance on *Janda* [was] misplaced." Brief for appellant at 29.

[8] Insofar as Justin claims the district court abused its discretion in weighing the various best interests factors relevant to a determination of legal custody, we again disagree. Under the Parenting Act, adopted by the Nebraska Legislature, the concept of child custody encompasses both physical custody and legal custody, with legal custody focusing entirely on decisionmaking authority. *Vyhlidal v. Vyhlidal*, 309 Neb. 376, 960 N.W.2d 309 (2021). The Parenting Act defines the term "[j]oint legal custody" as meaning "mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(11) (Cum. Supp. 2024). Thus, a trial court's award of sole legal custody essentially establishes that one party will have the final say in such fundamental decisions. See § 43-2922(13).

Under the district court's temporary order of joint legal custody, neither Justin nor Amy had final decisionmaking authority. As such, the other could effectively veto medical and educational decisions. The trial record is replete with such occurrences. As the trial court pointed out in its decree, Justin and Amy failed to agree on and communicate about several decisions affecting their children's education and health. Notably, the parties were unable to reach an agreement on a school for Holden, and as a result, the court was forced to make the determination. Amy wanted their son to attend a highly rated school located in Elkhorn, but Justin refused, implying he had insufficient time to reach a resolution. However, testimony elicited from Amy showed that multiple mediations on the issue were conducted, and Justin

even admitted that the Elkhorn school was only "[a]bout 10 minutes" from his house. It is inexplicable why Justin withheld his consent, especially since the parties had previously discussed moving to the Elkhorn school district before moving back to Nebraska.

Evidence adduced at trial also showed that Justin was minimally involved in his children's medical care. Prior to the commencement of dissolution proceedings, Justin was rarely present for medical appointments. Even after Justin became more involved under the temporary order, he failed to effectively communicate with Amy about medical care. This resulted in the administration of an oral antibiotic to Eleanor despite other care she was receiving from her treating physician. Justin readily admitted at trial that this was a "mistake." The court found that the "potential harm to the child was due to [Justin's] failure to communicate."

Justin takes issues with these findings, pointing to the medical note authored by one of Amy's coworkers who "[a]dvised" to take the oral antibiotic "as prescribed," along with the eardrops. However, Amy, a board-certified practitioner in family medicine, contradicted the contents of this note. She testified that she was not seeking a medical opinion from the coworker, that she spoke to him only generally, and that Eleanor had never seen him as a patient. She further opined that eardrops were the proper way to treat Eleanor's infection because oral antibiotics caused "resistance." We cannot say the district court abused its discretion by resolving these conflicts in the evidence and making the aforementioned findings. See *Scott v. Scott*, 319 Neb. 877, 25 N.W.3d 439 (2025) (when evidence is in conflict, appellate court considers and may give weight to fact that trial court heard and observed witnesses and accepted one version of facts rather than another). We also find it important to note that Justin refused to let Holden see a counselor. Despite initially agreeing to it upon the pediatrician's recommendation, he later, without explanation, withdrew his consent.

Upon our de novo review of the record, we cannot say that the district court abused its discretion in awarding Amy the sole legal custody of the children. The evidence, as outlined above, demonstrates that the parties had difficulty making fundamental educational and medical decisions for their children, and Justin's refusal to sign off on certain proposals or unwillingness to properly communicate was contrary to his children's best interests. It was reasonable for the court to conclude that the children's best interests would be served by awarding sole legal custody to Amy.

## 2. Child Support

Justin assigns two errors related to the district court's child support calculation. He first asserts that the court should have used the joint physical custody worksheet in calculating child support based on his number of days of parenting time, regardless of whether this court finds the district court abused its discretion regarding physical custody. Second, he argues the court erred in ordering an upward deviation based on the parties' total monthly net income. We address each argument in turn.

### (a) Joint Custody Worksheet

Justin contends that when determining his child support obligation, the district court erred in using the basic income and support calculation (worksheet 1), rather than the joint physical custody support calculation (worksheet 3). See Neb. Ct. R. ch. 4, art. 2, worksheet 1 (rev. 2016) and worksheet 3 (rev. 2007). He argues that a joint custody calculation is proper despite the court's award of sole physical custody to Amy, "because he exercises more than 142 days of parenting time per year." Brief for appellant at 29.

[9] In general, child support payments should be set according to the guidelines established pursuant to Neb. Rev. Stat. § 42-364.16 (Reissue 2016). *Larson v. Larson*, 33 Neb. App. 609, 23 N.W.3d 670 (2025). Although the guidelines are not to be applied with blind rigidity, child support shall

be established in accordance with the guidelines, unless the court finds that one or both parties have produced sufficient evidence to rebut the presumption that the application of the guidelines will result in a fair and equitable child support order. See § 42-364.16.

[10,11] Neb. Ct. R. § 4-212 (rev. 2011) states, in part: "When a specific provision for joint physical custody is ordered and each party's parenting time exceeds 142 days per year, it is a rebuttable presumption that support shall be calculated using worksheet 3." A "'day'" is defined "as including an overnight period." *Id.* Although the plain language of § 4-212 may suggest otherwise, this court has held that the joint physical custody worksheet may be proper "when the threshold amount of parenting time is met, even if no specific provision for joint physical custody is ordered." *Hill v. Hill*, 20 Neb. App. 528, 539, 827 N.W.2d 304, 313 (2013), *disapproved on other grounds, State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). This is because "the Nebraska Child Support Guidelines offer flexibility and guidance, with the understanding that not every child support scenario will fit neatly into the calculation structure." *Patton v. Patton*, 20 Neb. App. 51, 63, 818 N.W.2d 624, 635 (2012).

For example, in *Hill v. Hill, supra*, we concluded that a trial court abused its discretion by calculating child support based on the basic custody worksheet where a father exercised 156 days of parenting time, not including summer parenting time and holidays. We reasoned that while the mother was awarded sole physical custody of the parties' children, the father's parenting time exceeded the 142-day threshold described in § 4-212 and created a rebuttable presumption that support should be calculated based on joint physical custody. See, also, *Patton v. Patton, supra* (no abuse of discretion where trial court used joint physical custody worksheet when father had children at least 160 days per year, despite award of sole physical custody to mother).

However, our jurisprudence has long distinguished between continuous alternating custody schedules and more "'typical'" weekend, holiday, and summer parenting time schedules. *Hill v. Hill*, 20 Neb. App. at 535, 827 N.W.2d at 311. For instance, in *McDonald v. McDonald*, 21 Neb. App. 535, 840 N.W.2d 573 (2013), *disapproved in part on other grounds, Fichtl v. Fichtl*, 28 Neb. App. 380, 944 N.W.2d 516 (2020), we found no abuse of discretion where the trial court utilized the basic custody worksheet to calculate a father's child support, despite the fact that he had parenting time with the children for 163 to 166 days per year, or 44 to 45 percent of the time. Although we acknowledged the father's parenting time "raise[d] the presumption that he exercise[d] joint custody" under § 4-212, we observed that his parenting schedule "consist[ed] of alternating weekends, one weekday night, alternating holidays, and an extended time period in the summer." *McDonald v. McDonald*, 21 Neb. App. at 546, 840 N.W.2d at 585. We concluded his parenting time "constitute[d] a typical visitation schedule" that "rebutted the presumption of joint custody." *Id*.

Justin is afforded parenting time every Thursday night, every other weekend, and on rotating holidays, and he is given 7 days of "vacation time." Based on our calculations, excluding holidays and vacation time, he would have the children for a minimum of 130 days each year. However, the holiday schedule and vacation time could theoretically push him past the 142-day threshold contained in § 4-212. According to Justin, in "odd years," brief for appellant at 30, he would exercise "anywhere between 144 and 147 days" of parenting time but readily concedes that in "even years," he would only be guaranteed "at least 139 days," *id*. at 31.

Although the holiday split and allotted vacation time create the possibility that Justin's parenting time may exceed the 142 days in certain years, his parenting schedule is largely analogous to the one in *McDonald*. Just like that case, Justin's parenting time consists of alternating weekends, one weekday night, and alternating holidays. Since this is more akin to a

"typical" parenting time schedule that "rebut[s] the presumption of [a] joint custody" child support calculation, we cannot say that the district court abused its discretion in using worksheet 1 rather than worksheet 3. See *McDonald v. McDonald*, 21 Neb. App. at 546, 840 N.W.2d at 585.

Further, it is worth pointing out that while the fixed monthly child support obligation is less when using a joint physical custody calculation, the financial responsibility for other child-related expenses may increase. Section 4-212 of the guidelines states that when child support is determined using worksheet 3, "all reasonable and necessary direct expenditures made solely for the child(ren) such as clothing and extracurricular activities shall be allocated between the parents." Thus, a higher monthly child support obligation under worksheet 1 may be preferable to a lower amount under worksheet 3, because the latter would require the parties to discuss and agree on what qualifies as "reasonable and necessary direct expenditures." Given the parties' difficulty in communications and their disagreements regarding extracurricular activities, the district court properly exercised its discretion in electing to use worksheet 1, rather than worksheet 3.

### (b) Deviation

[12] Justin next argues the district court abused its discretion by ordering an upward deviation from the Nebraska Child Support Guidelines based upon the parties' combined monthly net income exceeding $20,000 per month. The child support calculation attached to the decree reflects a combined monthly net income of $23,612.76, of which $17,245.70 is attributable to Amy's income and $6,367.06 is attributable to Justin's income. Neb. Ct. R. § 4-203(C) (rev. 2020) of the guidelines expressly provides that a deviation from the guidelines is permissible when the total net income exceeds $20,000 per month. Section 4-203(C) states:

> [I]f total net income exceeds $20,000 monthly, child support for amounts in excess of $20,000 monthly may be

more but shall not be less than the amount which would be computed using the $20,000 monthly income unless other permissible deviations exist. To assist the court and not as a rebuttable presumption, the court may use the amount at $20,000 plus: 10 percent of net income above $20,000 for one, two, and three children; 12 percent of net income above $20,000 for four children; 13 percent of net income for five children; and 14 percent of net income for six children.

Section 4-203 of the child support guidelines also states, in relevant part:

The child support guidelines shall be applied as a rebuttable presumption. . . . All stipulated agreements for child support must be reviewed against the guidelines and if a deviation exists and is approved by the court, specific findings giving the reason for the deviation must be made. Findings must state the amount of support that would have been required under the guidelines and include a justification of why the order varies from the guidelines. Deviations must take into consideration the best interests of the child. In the event of a deviation, the reason for the deviation shall be contained in the findings portion of the decree or order, or worksheet 5 should be completed by the court and filed in the court file.

Section 4-203 then goes on to list permissible deviations in subsections (A) through (E), with subsection (C), as set forth above, at issue here.

[13] The Nebraska Supreme Court has stated that the "trial court is required to state the amount of support that would have been required under the guidelines absent the deviation[,]" and "[a]lthough either stating the reason for the deviation in the decree or order or completing worksheet 5 is sufficient, we encourage trial courts to do both." *Brooks v. Brooks*, 261 Neb. 289, 293, 622 N.W.2d 670, 674 (2001). *Brooks* did not involve the higher income deviation found in § 4-203(C). However, this court has previously concluded

that § 4-203 requires either an explanation for an upward deviation or the completion and filing of a worksheet 5. See *Roberts v. Roberts*, 25 Neb. App. 192, 903 N.W.2d 267 (2017) (finding abuse of discretion when district court order found upward deviation was in children's best interests but did not specifically explain its reasoning, nor attach worksheet 5 to its order).

In the present case, the district court provided no explanation for deviating upwards from the child support obligation set forth in worksheet 1. There is also no worksheet 5 attached to the child support calculation. Worksheet 5 is titled "Deviations to Child Support Guidelines." See Neb. Ct. R. ch. 4, art. 2, worksheet 5 (rev. 2020). However, there is an attachment titled "Section 4-203(C) Additional Support Calculation (Optional)," which presents information equivalent to a worksheet 5. This court has previously accepted a similarly titled worksheet when considering the requirements under the guidelines for an upward deviation. See *Furstenfeld v. Pepin*, 23 Neb. App. 155, 869 N.W.2d 353 (2015). Further, Justin states in his brief that the "court did create a worksheet 5 with the higher amount but the decree is silent as to that deviation." Brief for appellant at 31.

Accordingly, Justin does not challenge the form or substance of the deviation attachment; rather, he asserts the district court's deviation was "antithetical to the purpose" of the Nebraska Child Support Guidelines because it "results in the less economically advantaged spouse paying even more in support." Brief for appellant at 32-33. He contends that this upward deviation should apply only when the party obligated to pay child support earns more than $20,000 per month.

There is certainly some merit to Justin's argument, particularly that it draws attention to the fact that the rule does not account for any disparity in the parties' incomes, such as the situation here where the party receiving child support earns significantly more income than the party paying it. Section 4-203(C) permits an upward deviation when the combined

monthly net income exceeds $20,000, regardless of whose income may be primarily or even solely responsible for triggering the potential deviation.

In circumstances such as these, it would have been helpful if the district court had provided an explanation for why a deviation from worksheet 1 was appropriate and in the children's best interests, given the financial circumstances of the parties. However, based on the plain language of § 4-203, so long as a worksheet 5 (or a sufficiently equivalent form, as in this case) is attached to the decree or order, § 4-203 does not require the trial court to provide any justification for the deviation. Worksheet 5 itself does not require any explanation, just the identification of which subsection of § 4-203 applies. Therefore, although this court may not agree that an upward deviation was justified given the financial circumstances of the parties in this case, we cannot say it was an abuse of discretion for the trial court to order the deviation, because it complied with the requirement of § 4-203 that the court either state its "reason for the deviation" in its decree *or* complete a worksheet 5. Although encouraged to do both, see *Brooks v. Brooks, supra*, the trial court was not required to do so.

### 3. Castelar Home

Justin next argues that the district court erred when it failed to set aside more of the home equity accumulated during the marriage as his separate property. From the time the parties moved to New Mexico in 2017 to the time they returned to Nebraska in 2021, equity in the Castelar home increased by $81,135.41. Justin argues this equity is properly categorized as separate property because the increase was caused by "passive" appreciation of the residence and therefore not subject to equitable division. Brief for appellant at 34. He takes no issue, however, with the court's classification of the growth in home equity from 2021 onward as marital property. For the reasons explained below, we find no abuse of discretion.

(a) General Principles of Law

[14-16] Under Nebraska's dissolution statutes, "[t]he purpose of a property division is to distribute the marital assets equitably between the parties." Neb. Rev. Stat. § 42-365 (Reissue 2016). The equitable division of property is a three-step process. The district court (1) classifies the parties' property as marital or nonmarital, setting aside nonmarital property to the party who brought that property to the marriage; (2) values the marital assets and marital liabilities of the parties; and (3) calculates and divides the net marital estate between the parties in accordance with the principles contained in § 42-365. *Dibuono-Gonzalez v. Gonzalez*, 32 Neb. App. 881, 7 N.W.3d 672 (2024). Justin's argument concerns the first step. The extent to which property is marital versus nonmarital presents a mixed issue of law and fact. *Stava v. Stava*, 318 Neb. 32, 13 N.W.3d 184 (2024). The manner and method of acquisition involve questions of fact, but the classification of the property under those facts is a legal question and not a matter of the court's discretion. *Id.* All property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to this general rule. *Dibuono-Gonzalez v. Gonzalez, supra*.

[17] Relevant to this appeal, however, any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital while another portion can be separate property. *Stava v. Stava, supra*. This includes real estate brought into the marriage by one party. While equity in property at the time of marriage is a nonmarital asset which, if established should be set aside as separate property, any active appreciation (i.e., the increase in a nonmarital asset's value due to a contribution of marital funds or efforts) will be deemed marital. See *id.* But passive appreciation of property (i.e., the increase in a nonmarital asset's value due to separate contributions and nonmarital forces) is not subject to equitable division. See *id.*

[18,19] The Nebraska Supreme Court has observed that real estate, by its nature, is more prone to passive appreciation. See *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). This is because real estate tends to rise and fall in value for reasons beyond the parties' control. *Id.* Ultimately, whether appreciation in real estate is active or passive depends on the facts and circumstances of each case. *Id.* In that regard, evidence relating to the cause of appreciation is key, and the burden is on the owning spouse to prove the extent to which marital contributions did not cause the appreciation or income. *Id.* Unless an exception applies, the burden of proof in civil cases requires only a greater weight of the evidence. *Backhaus v. Backhaus*, 318 Neb. 891, 20 N.W.3d 81 (2025). The greater weight of the evidence means evidence sufficient to make a claim more likely true than not true. *Id.* Thus, at trial, Justin had to show by a greater weight of the evidence that the cause of any appreciation of his home was not the result of marital contributions or efforts.

[20-23] The acquisition of property in the first instance can be an ongoing process. *Stava v. Stava, supra*. It occurs only as it is paid for, as the real value of property is the equity and not the mere legal title. *Id.* Under the "'source of funds' rule, acquisition of encumbered property only occurs when and to the extent it becomes unencumbered by paying off the principal of an encumbering loan." *Id*. at 43-44, 13 N.W.3d at 194. Thus, the use of marital funds to pay down the mortgage on what was initially separate property acquires the property during the marriage to the extent the principal is paid, creating a proportionate marital interest in that property. *Id.* Because the proportion of the property's equity created during the marriage with marital funds constitutes marital property, the appreciation on that equity, whether it be passive or active, is also marital property. *Id.*

With these general principles in mind, we address Justin's arguments.

(b) No Abuse of Discretion

On appeal, it is undisputed that Justin purchased the Castelar residence before his marriage to Amy. At trial, Justin offered, without objection, a retroactive appraisal of the home at the time of the parties' marriage, along with a corresponding mortgage statement. These documents showed $90,901.35 in premarital equity ($178,000 home value minus $87,098.65 mortgage). The district court set this equity aside as Justin's separate property.

Shortly after their marriage in 2017, the parties moved to New Mexico. During this time, Justin rented out the Castelar residence and continued to pay down the mortgage on the home. Justin and Amy returned to Nebraska in 2021, moved into the home, and lived there together until shortly after the commencement of dissolution proceedings in 2023. Another retroactive appraisal offered by Justin at trial showed equity in the home increased to $172,036.76 ($230,000 home value minus $57,963.24 mortgage) as of the time the parties moved back to Nebraska in 2021. Justin argues this $81,135.41 increase in equity from 2017 to 2021 is nonmarital and not subject to equitable division because it was not the result of active appreciation.

In its decree, the district court concluded that Justin "failed to meet his burden of proof" that "any appreciation to the real estate was not the result of active appreciation." It calculated the marital interest in the Castelar home to be $152,565 ($243,466 equity at time of separation minus $90,901 premarital equity). In reaching this determination, the court reasoned:

> There is no dispute that marital contributions had been made to the real estate. Both parties testified that the improvements were made to the real estate and at least [Amy] testified those improvements increased the value of the real estate while [Justin] simply deferred to his appraiser.

According to the court, these "improvements" included "a new roof, carpeting, HVAC, windows and a shed." Justin

takes issue with the court's findings, claiming the evidence at trial showed no improvements to the property were made between 2017 and 2021. He argues that the increase of the home's market value was the result of nonmarital forces (i.e., market forces). He does concede, however, that "[active] appreciation" began in 2021 "when the parties removed the renters and lived at the Castelar house." Brief for appellant at 34-35.

However, equity can accumulate in two ways: (1) through the appreciation of the property's market value via market forces or capital improvements and (2) by paying down encumbrances on the property. At trial, Justin testified that he continued to "pay[] the mortgage" on the residence while the parties were in New Mexico. No evidence was introduced by Justin to suggest the funds used to pay on the mortgage were nonmarital. See *White v. White*, 320 Neb. 256, 26 N.W.3d 924 (2025) (burden of proof rests with party claiming that property is nonmarital). As mentioned previously, under the source of funds rule, this created a marital interest in any appreciation on equity in the Castelar home, whether passive or active, to the extent that its equity increased due to marital funds being used to pay down the mortgage. See *Stava v. Stava*, 318 Neb. 32, 13 N.W.3d 184 (2024). Justin claims the source of funds rule does not apply in this case "[d]ue to the fact the entire mortgage was not paid" off during the marriage. Brief for appellant at 35. However, the Nebraska Supreme Court has been clear that acquisition of property "occurs only as it is paid for, as the real value of property is the equity and not the mere legal title." *Stava v. Stava*, 318 Neb. at 43, 13 N.W.3d at 194. There is no requirement that the mortgage be fully paid off during the marriage in order for marital equity to be determined.

[24,25] When acquisition occurs via payments on the principal of encumbering debt, the marital estate receives not just a refund of the monetary contribution toward the principal of the loan, but also a fair return on its investment, which

includes passive appreciation. *Id.* A trial court "is to divide the passive appreciation proportionately between the marital and separate interests if marital funds were used to pay down the principal of a mortgage for property that appreciates during the marriage due to passive market forces." *Id.* at 44, 13 N.W.3d at 194-95.

Further, we agree with the district court that Justin failed to prove that any appreciation from 2017 to 2021 was not the result of marital contributions or efforts. Both parties agreed at trial that several improvements were made to the home during the marriage. Although Justin acknowledges some post-2021 improvements, he argues that there was no testimony of any repairs between 2017 and 2021. However, other evidence indicated that repairs and improvements did take place over those years. The retroactive appraisals show that a "new" water heater was installed in August 2019 and "new" carpet was installed in May 2021, both before the parties moved back to Nebraska the following month. Also, Justin acknowledged that he "managed" the property while living in New Mexico and that his leases had a clause where he was responsible for fixing damages $500 or more. He did not remember whether any tenants called to complain about any repairs or improvements.

It was Justin's burden to prove by a greater weight of the evidence that the appreciation in equity of the Castelar residence was not the result of marital contributions or efforts. See *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). There was evidence in the record to suggest that at least some improvements were made between 2017 and 2021 and that Justin remained involved in managing the property while the parties lived in New Mexico. Justin offered no evidence to rebut the presumption that these improvements and his efforts contributed to the appreciation of the home. Thus, we cannot say the district court abused its discretion in determining the amount of marital equity in the Castelar property.

### 4. Escrow Funds

In his last assignment of error, Justin argues the district court abused its discretion by "failing to assign a value to the escrow refund received by [Amy] in August of 2023." Brief for appellant at 36. He requests that the "entire escrow amount be returned . . . in a separate judgment." *Id.* at 37.

There was no evidence tracing the funds from Justin's mortgage company to Amy's personal account. Although the trial record regarding the escrow funds is scarce, Justin testified that Amy received $2,364.37 in an escrow overpayment after she canceled insurance for the Castelar home. According to Justin, this amount was "sent to her checking account." To support these contentions, he offered an "Escrow Review Statement" from June 2023 that showed $2,364.37 was paid to "USAA" in May 2023. However, Justin conceded at trial that he had no documentation tracing the funds from USAA to Amy's personal account. When asked if he ever requested those documents, he simply "defer[red] to [his] attorney."

During her testimony, Amy stated "a reimbursement [was] paid out at some point" but "there were multiple things paid" because of "multiple cancellations." She "wasn't sure what belonged to what." While Amy agreed that Justin's escrow money was marital, she could not recall an exact figure that was paid to her. Thus, while there was evidence that a refund may have been received among other insurance payouts, there was no evidence tracing the escrow payment to Amy or revealing the amount paid.

Due to this lack of evidence, we cannot say the district court abused its discretion by not including the escrow refund in the marital estate and assigning it a value.

### VI. CONCLUSION

For the foregoing reasons, we affirm the district court's decree of dissolution of marriage and its amendments.

Affirmed.